[Civ. No. 5642. Third Appellate District.—February 9, 1937.]

THE TEXAS COMPANY (a Corporation), Appellant, v. BARTELL TODD, Respondent.

Charles C. Stanley, R. K. Barrows and H. B. McClure for Appellant.

McFadzean & Crowe and Farnsworth, Burke & Maddox for Respondent.

THOMPSON, J.—The plaintiff has appealed from a judgment which was rendered in its favor for the sum of $8,762.73, as the contract price of gasoline sold to the defendant. The appellant contends the judgment should have been rendered for the sum of $14,835.15, pursuant to the price which was established for the sale of a new and cheaper brand of gasoline which was not on the market in California at the time the contract was executed, and which was therefore not contemplated by the parties in the execution of the original contract, but which price was established by subsequent telegrams modifying the original contract. A controversy exists over the discount to which the defendant, as sole distributor of the Texas Company, is entitled upon the purchase of the new brand of gasoline. It is stipulated that if the defendant is not entitled to credit for money overpaid on the basis of 2½ cents per gallon discount pursuant to the terms of the original contract the plaintiff will then be entitled to judgment for the additional sum of $6,072.42 and interest as prayed for.

June 1, 1931, The Texas Company, a California corporation, executed a written agreement to sell gasoline to the defendant as its exclusive distributor of petroleum products in Tulare County, for a period of three years, in consideration of a discount from the wholesale price thereof of 2½ cents per gallon for ''Auto Gasoline and Ethyl Gasoline''. The contract reads in part:

''Contract . . . of sale made on the first day of June, 1931, between The Texas Company, . . . hereinafter caller Seller, and Bartell Todd, hereafter allotted Tulare county as his exclusive territory, . . . hereinafter called Purchaser.

"2. Products and Quantity. A quantity of gasoline, kerosene, lubricating oils, greases and other petroleum products equal to the entire requirements of purchaser in his business of distributing petroleum products for the period and at the distribution points shown below, but not to exceed in any one year, except by mutual consent: . . .

"5. Prices. *For Auto Gasoline, Ethyl Gasoline* in tank car lot, the Seller's respective tank wagon marketing prices in effect at the respective points of distribution at the time of shipment. ·

"(a) less 2½c per gallon *for Auto Gasoline* on purchases up to and including 100,000 gallons during one calendar month, and 2c per gallon for all purchases in excess of this amount during said month. . . .

"(c) . . . Should any question arise as to any such tank wagon market price, Seller, at its option, may suspend all shipments of the product involved until the question is settled and shall not be obliged to make up the shipments so suspended.

"For all other products the regular schedule price of Seller in effect at time of shipment as listed in Seller's regular selling schedule in effect at its Los Angeles District: . . .

"Prices are F.O.B. Seller's shipping point with freight allowed to point of destination.

"6. Terms and places of payment.

"Gasoline and Kerosene: Net 15th proximo or less 1% for cash in 10 days. . . .

"A failure to pay any amount when due may at the option of the seller terminate the contract as to further deliveries and no forbearance, course of dealings, or prior payment, shall affect this right of the Seller."

No petroleum products are involved in this suit except gasoline. The price of no gasoline is questioned except that of a cheaper, third grade product called Calpet Greenlite Gasoline, which was produced and marketed in California after the contract was executed to meet the competition of a similar cheaper product which was being sold by other major companies. At the time of the execution of the contract with the respondent, The Texas Company possessed and marketed in California only two grades of gasoline. These two grades are referred to in the contract as "Auto Gasoline" and "Ethyl Gasoline". The latter contains tetraethyl lead.

It has a higher octane rating, combustion occurs with less heat and it is considered a higher grade of gasoline which will start an engine easier in cold weather and will furnish better mileage than ordinary gasoline. It is referred to as "premium gasoline". The only other grade of gasoline marketed by The Texas Company in California at the time the contract was executed was referred to as "Auto Gasoline". It is contended it had no specific trade name. It may be assumed it required no trade name, since the only other grade of gasoline which the appellant then marketed was distinguished from its ordinary or standard grade by the use of the term "Ethyl Gasoline". By the terms of the contract this standard grade of gasoline was sold to the respondent for a discount of $2\frac{1}{2}$ cents per gallon from the regular tank wagon market price of that commodity. There is no controversy regarding that fact. No dispute arose over the price to the respondent of this standard grade until a cheaper grade was marketed in Tulare County.

The respondent had a large number of customers in Tulare County to whom he regularly sold the Texas petroleum products. Soon after the execution of the contract he began to urge The Texas Company to supply him with a cheaper grade of gasoline to enable him to compete with the products of other gasoline companies. Small companies were selling a cheap gasoline which was commonly termed "bootleg gasoline". It was inferior to standard grades supplied by the major companies. To meet this competition other major companies also manufactured and sold in that territory cheaper grades of gasoline. There is some evidence that The Texas Company sold a lower grade of gasoline in the eastern states before the contract was executed. The evidence is uncontradicted that it did not market a third grade gasoline in California until December, 1931, about six months after the contract was executed. It then began to supply the market and sell an inferior, third grade gasoline, called "Calpet Greenlite" gasoline in and about San Diego. The process for producing this inferior gasoline enabled the company to manufacture it for three-fourths of a cent per gallon less than its standard gasoline. The profit to The Texas Company on sale of this third grade gasoline was less than that which was derived from higher grades. This third grade gasoline remained the same during all the time in-

volved in this controversy except that its color was changed from green to white, and it was sometimes called "Calpet", sometimes "Greenlite" and sometimes "Calpet Greenlite". At his urgent request the third grade gasoline was first supplied to the respondent for sale in his territory April 19, 1932. While Mr. Todd testified that prior to the execution of the contract he talked with some of the officers of The Texas Company regarding the previous marketing of a cheaper grade of gasoline in the eastern states, there is no evidence indicating that the parties to this contract ever discussed or considered the price at which that third grade gasoline would be furnished to the respondent in the event that it should ever thereafter be introduced for sale in California. It is not contended the parties to the contract ever discussed the question prior to the execution of the contract as to whether any other grade of gasoline which might thereafter be produced by The Texas Company would be considered to be included in the term "Auto Gasoline" which term was used in the contract, or that it would be furnished for the same price which was fixed for that grade.

Prior to the purchase of third grade Calpet gasoline in July, 1932, the respondent knew that The Texas Company did not consider that its contract covered this new, inferior grade. Mr. Todd knew the company did not intend to sell Calpet to him at a 2½ cents discount from the wholesale market price thereof. He testified in that regard:

"When the new grade of gasoline known as Calpet was introduced they (the officers of The Texas Company) told me that my contract didn't cover it and I would have to modify the contract and work on a smaller spread or I couldn't have that gasoline. . . . He (Mr. Faerber) replied (to my demand for a discount of 2½ cents per gallon on this third grade) that it was their marketing plan not to give any of their distributors or dealers full spread on this Calpet."

February 27, 1932, nearly two months before the third grade gasoline was first delivered to the respondent, he wrote The Texas Company as follows:

"Please advise this office by letter, if the Green gasoline you are marketing in the San Joaquin Valley, adjacent to my territory, is included in my Distributor's contract with your company. . . . "

After an exchange of letters, The Texas Company wired Mr. Todd, March 23, 1932, in part:

" . . . *Greenlite is not a part of your present contract.* . . . We will gladly modify your present contract to include Greenlite and allow you margin of one and quarter cents below our Greenlite wholesale price. . . . "

After several communications, Mr. Todd wired the company March 24, 1932, as follows:

"I need third grade gasoline to meet competition. . . . Please wire postal telegraph maximum margin you will allow me on Greenlite."

To which the company replied by wire March 25, 1932:

" . . . Distributor's rate on Greenlite on basis present price of like product your territory will be one and quarter cents per gallon and this is maximum allowance. . . . "

After much controversy and an exchange of many communications, The Texas Company wired respondent April 12, 1932, that it would allow him a discount on the price of Greenlite gasoline of 1½ cents per gallon, in reply to which Todd wired the company April 13th:

" . . . My dealers are desperate for a competitive priced gasoline, *so rush my first shipment of Greenlite to Porterville today at your quotation.* . . . "

Pursuant to the terms which allowed the respondent a discount of 1½ cents per gallon on Greenlite gasoline, he purchased and sold to his customers in Tulare County 18,000 gallons in April, 20,000 gallons in May and 30,000 gallons in June. Invoices covering those sales of Calpet gasoline were billed each week to Mr. Todd. He took advantage of the agreement for a discount of 1 per cent for cash and promptly paid these bills without reservation within ten days of the respective dates on which they were rendered.

The controversy regarding the discount to be allowed the respondent on Greenlite gasoline continued. Numerous letters and messages were exchanged. The situation with respect to that subject remained the same as above stated. June 28th Mr. Todd wrote the company:

"Please wire this office, as quickly as possible, your offer to sell us your third grade gasoline, under the new price structure, since our margin of profit enjoyed to date, is no longer acceptable."

To this letter the company replied:

"Your letter Calpet Greenlite gasoline. Allowance remains same as previous quotation."

Pursuant to numerous demands the company made a further concession to the respondent in a telegram dated July 8, 1932. It reads:

" . . . Calpet Greenlite Gasoline will be sold on basis wholesale price in effect less one and half cents per gallon. However at no time shall the price to you for Calpet Greenlite gasoline be greater than one quarter cent below the price which you pay for Firechief gasoline under your distributor's agreement. On present price structure this will make necessary a special allowance of one and quarter cents per gallon. Wire acceptance this arrangement."

To this message Mr. Todd replied July 9, 1932:

"Your offer to sell me Greenlite satisfactory based on present price structure making my Visalia cost twelve three quarter cents and Porterville one half cent cheaper."

"Firechief" was the name given to the standard or medium grade of gasoline when The Texas Company placed the third grade gasoline on the market. Pursuant to the preceding modification of the original contract or agreement to allow 1½ cents per gallon on Greenlite gasoline, the respondent purchased from The Texas Company an increasing quantity of that third grade gasoline from 18,000 gallons in July, 1932, to 156,000 gallons in November of 1933. Invoices were sent to the respondent covering each of these sales of gasoline, specifying the dates of sales, the number of gallons sold, the market price per gallon and the total purchase price thereof. These bills were promptly paid in full by the respondent without reservation. At no time did he make these payments under protest. He was credited with the discount as above specified. After November 29, 1933, the respondent refused to accept further deliveries of Calpet gasoline at a price which would allow him a discount of only 1½ cents per gallon. A large proportion of the gasoline received by the respondent in the month of November was not paid for. December 9, 1933, this suit was brought against him "on an open book account for goods sold and delivered by the plaintiff to defendant" in the sum of $14,892.13. The defendant answered the complaint denying that he owed on the account more than the sum of $8,173.75 and accrued interest. Thereupon he tendered the sum of money to plaintiff

which was refused. A cross-complaint was also filed in which the written contract of June 1, 1931, was alleged. It was asserted the original contract entitled respondent to a discount of 2½ cents per gallon from the wholesale prices upon all Calpet Greenlite gasoline which he had purchased, and that he was entitled to a continuation of the delivery of that grade of gasoline at the same discount during the entire term of three years from the date of the contract; that the payments of previous bills, pursuant to statements rendered, were not voluntarily made, but on the contrary that they were paid under coercion, and that the overpayments which were made on such bills as were rendered entitles the respondent to a credit of $6,718.38 upon the amount sued for. The respondent asked for an injunction restraining the plaintiff from refusing to deliver its petroleum products to the defendant pending the determination of the action. A temporary restraining order was granted. The material allegations of the cross-complaint were denied. The cause was tried by the court sitting without a jury. Findings were adopted favorable to the defendant in which it was determined that the term "Auto Gasoline", which was used in the written contract, included the new, and cheaper third grade called Calpet Greenlite gasoline which was subsequently placed on the market in defendant's territory. The court found that under the terms of the original contract the defendant was entitled to a discount of 2½ cents per gallon from the wholesale price of the new third grade gasoline, and that the plaintiff was therefore entitled to recover a judgment for only the sum of $8,762.73. Judgment was thereupon rendered in favor of the plaintiff for the sum of $8,762.73. From that judgment the plaintiff has appealed. It is stipulated that if this court determine that the written contract does not include an agreement to furnish the new grade of Calpet gasoline to the defendant for a discount of 2½ cents per gallon from the wholesale price thereof, and that the telegrams and correspondence which passed between the parties after the Calpet Greenlite gasoline was placed on the market constitute a modification of the contract with respect to that particular grade of gasoline, then the amount of the judgment which should be rendered in favor of the plaintiff is the sum of $14,835.15. In other words, it is stipulated that the amount of discount which is involved on this appeal is $6,072.42.

The appellant contends that the findings and judgment are not sustained by the evidence for the reasons that by the terms of the written contract The Texas Company did not agree to sell to the defendant Calpet Greenlite gasoline at a discount of 2½ cents per gallon; that the voluntary payments without protest of the several statements which were rendered for all petroleum products, including Calpet gasoline, except for the month of November, 1933, constitutes stated accounts by conceding the modified rate of discount for the third grade of gasoline and precludes the defendant from now claiming an additional discount thereon; that the subsequent telegrams and communications which were transmitted between the parties create a modification of the original contract and merges therein the agreed discount of 1½ cents per gallon on the purchase of Calpet Greenlite gasoline sold to the defendant; and that by his conduct the defendant led plaintiff to believe he had agreed to accept 1½ cents per gallon as discount on the purchase of Calpet gasoline, and under the terms of section 1962 of the Code of Civil Procedure the defendant is therefore estopped from now repudiating that agreement.

We are constrained to hold that the findings and judgment are not supported by the evidence. The contract must be construed in the light of the circumstances surrounding its execution. The evidence is uncontradicted that at the time of the execution of the contract and for more than six months thereafter The Texas Company did not manufacture or market in California Calpet gasoline, or any third structure product. It then sold in this state only two grades of gasoline. They were specified in the contract as "Auto Gasoline" and "Ethyl Gasoline". It is true that the defendant testified he had heard that the company previously sold a third grade gasoline in the eastern states. He said that he talked with some of the officers regarding that fact. The defendant, however, does not pretend to say· that anything was said between them regarding the application of the contract to a third grade product or the discount to be allowed therefor in the event it should be thereafter manufactured and sold in California. There is no evidence that the use of third grade gasoline in California was contemplated at the time of the execution of the contract. From the entire record and correspondence which passed between the parties we are

driven to the conclusion they did not discuss or consider the use or cost of a third grade gasoline to be introduced in California. Of course, the plaintiff had no right to sell an inferior grade of gasoline or any other petroleum product to persons in Tulare County other than the defendant, for he had a contract for the exclusive handling of the Texas Company's products in that territory. But that exclusive right does not necessarily mean that the price of the new grade of gasoline was agreed upon. That depends upon a construction of the contract itself. In the absence of evidence to the contrary, we assume the use of the two terms applying to the only grades of gasoline then manufactured and marketed by the plaintiff in California necessarily excludes a commodity not then in existence. The term ''Auto Gasoline'' was used to designate the ordinary or standard grade of gasoline as distinguished from ''Ethyl Gasoline'' which is a higher or premium grade of gasoline. It is argued that the term ''Auto Gasoline'' merely means any gasoline then used or which might thereafter be marketed by the plaintiff, which is *suitable for use in an automobile*. It will be observed the contract does not merely refer to automobile gasoline, as a general term. It capitalizes the first letters of each word, and abbreviates the first word to ''Auto''. We assume this was done for some purpose. If that term merely meant ''any gasoline suitable for use in an automobile'', then it would have been unnecessary to have also designated the higher grade of ''Ethyl Gasoline'' for that product is also suitable for use in an automobile. ▆▆ It is not disputed that this third grade of gasoline called ''Calpet Greenlite'' was subsequently manufactured and sold in California merely to compete with cheaper grades of gasoline which were sold by other companies. It is conceded the inferior grades of gasoline may not be sold on the market for the same profit which is derived from the sale of the higher grades, in spite of the fact that the manufacture of Calpet gasoline costs the company three-fourths of a cent per gallon less than the standard grade. Knowing that to be a fact, it seems improbable that either party intended to consent to fixing the discount price of the third grade gasoline at the same rate as other more profitable products. There is neither direct evidence nor reasonable inferences from which it may be assumed the price or discount for third grade gasoline, which

was marketed for the first time in California six months after the execution of the contract, was intended by the parties to have been established by the original written agreement. The subsequent communications by means of telegrams and letters indicate that the parties' minds did not unite in agreeing upon the discount to be allowed the defendant on the purchase of third grade gasoline.

When an appeal depends solely upon the construction to be given to the language of a contract from the instrument itself the reviewing court is called upon to determine the meaning thereof as a matter of law. Under such circumstances the rule on appeal which precludes the appellate court from disturbing the determination of the trial court when there is substantial evidence to support its conclusions has no application. (*Lachman Co.* v. *Central Calif. Berry Growers' Assn.*, 58 Cal. App. 748 [209 Pac. 379].) In the present case there is no evidence to support the finding that the contract fixes the discount to be allowed the defendant on the purchase of the third grade gasoline which was not mentioned or contemplated in the agreement.

Assuming without so deciding that the contract did include the definite fixing of a discount of 2½ cents per gallon on third structure gasoline which was subsequently produced, we are of the opinion the telegrams and letters, which were transmitted between the parties, clearly indicate that they recognized the fact that a controversy existed between them regarding the discount to be allowed, and that they compromised that dispute and modified the contract or enlarged its terms so as to cover the omission and settle the difference by allowing a discount of 1½ cents per gallon on the third grade gasoline. The telegrams of July 8th and 9th, 1932, settled the dispute regarding that feature of the contract. That compromise agreement merged in the contract and became a part of it. There is no doubt the law authorizes such a modification or addition to a written executory contract by a written stipulation evidenced by the subsequent telegrams or letters. (*Rosenberg* v. *George A. Moore & Co.*, 194 Cal. 392, 403 [229 Pac. 34]; 6 Cal. Jur. 372, sec. 225.)

The respondent contends the modification of the contract with respect to the discount to be allowed on the purchase of third grade gasoline is void for lack of consideration. We think not. In effect the new agreement does not change

the terms of the original contract. It merely supplies an omission to cover a feature which did not exist at the time of the execution and which was not contemplated by the parties in the original contract. By the terms of the contract the defendant was constituted exclusive agent of The Texas Company to sell and distribute all its petroleum products in the county of Tulare, but it did not specify the discount to be allowed on the purchase of the new third grade gasoline. Under such circumstances we are of the opinion the same consideration which furnished the basis for the original contract also applies to the contract with its added obligations. In 13 Corpus Juris, page 592, section 607, it is said in that regard:

"Errors in a contract may be corrected *and omissions supplied without a new consideration,* hence no consideration is necessary where an agreement is merely explanatory of the terms of an existing contract."

It is further said in section 608 of the last cited authority:

"In accordance with the general rules governing consideration which have already been discussed, it has been held that a modified contract *may be supported by a consideration consisting in the compromise or adjustment of a doubtful or disputed claim."* (6 R. C. L. 919, sec. 302.)

With respect to that portion of the discount which has been paid, the defendant is estopped from denying that the addition to the contract was without consideration. In 13 Corpus Juris, page 592, section 607, it is said in that regard:

"Where a modified agreement has been fully executed, it will not be disturbed for a want of consideration."

We are of the opinion there is ample consideration to support the modification of the contract with respect to the mutual agreement regarding the discount to be allowed on the purchase of Calpet Greenlite gasoline.

The undisputed record also discloses another reason why the defendant may not claim the right to a discount of 2½ cents per gallon for the Calpet Greenlite gasoline purchased prior to November, 1933. Statements including all purchases of Calpet gasoline at the reduced discount of approximately 1½ cents per gallon, from April, 1932, to November, 1933, were regularly sent to the defendant, who promptly paid them in full as they were rendered, without protest.

These voluntary payments preclude the defendant from subsequently disputing the accuracy of the discounts allowed. (21 R. C. L. 141, sec. 165; *Brumagim* v. *Tillinghast*, 18 Cal. 265 [79 Am. Dec. 176] ; *Shelley* v. *Board of Trade*, 87 Cal. App. 344 [262 Pac. 403] ; 64 A. L. R., p. 10, note.)

In 21 Ruling Case Law, page 141, section 165, it is said in that regard:

"It is a universally recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back on the ground that the claim was illegal."

And it is said in the note found in 64 American Law Reports, at page 31, regarding the subject of a voluntary payment:

"A payment of taxes *under a compromise agreement* between the payee and the taxing officials, whereby some controversy is settled, or the payee gains some benefit, or the taxing authorities forego some right or advantage, is held to be a voluntary payment."

It is, however, insisted by the respondent in this case that his payments of the various statements which were rendered to him from April, 1932, to November, 1933, were involuntary for the reason that the contract provides:

"Should any question arise as to any such tank wagon market price, seller, at its option, may suspend all shipments *of the product involved* until the question is settled. . . . "

"A failure to pay any amount when due may at the option of the seller terminate the contract as to further deliveries."

The respondent asserts that he was coerced into paying the bills rendered for the reason that a failure to pay the claims entitled The Texas Company to refuse to make further shipments of Calpet Greenlite Gasoline to him, and his business would be thereby greatly impaired and damaged. That his business required third grade gasoline with which to compete with other gasoline distributors in Tulare County may be controverted. It must be conceded that the lack of cheaper third grade gasoline with which to meet the competition of other distributors in that county would have caused substantial loss of both The Texas Company and the defendant. It is true that payments of illegal claims which are enforced by duress, coercion or compulsion, when the payer has no other adequate remedy to avoid it, will be deemed to have

been made involuntarily, under which circumstances such payments may be recovered in a subsequent suit. (21 R. C. L. 145, sec. 169.) In the case of *Young* v. *Hoagland,* 212 Cal. 426 [298 Pac. 996, 75 A. L. R. 654], upon which the respondent relies, it was held that an illegal assessment which had been levied against corporation stock, which the directors threatened to sell for non-payment thereof, might be paid by the owner without waiving his right to reimbursement, for the reason that the circumstances amounted to a collection of the assessment by coercion. But the rule is well established that to authorize reimbursement the payment must have been enforced by coercion *and that no other adequate means of preventing the loss is available.* In 21 Ruling Case Law, page 149, section 174, it is said in that regard:

"There must be a pressing, controlling and immediate necessity on the person making the payment to render it compulsory or involuntary. The illegal demand must be accompanied by the apparent power, at least, to carry the threat of enforcement into immediate execution, and there must be no avenue of immediate escape from the threatened injury other than by making the illegal payment. But where dispute arises and the debtor, who pays under protest, has at hand reasonable means of immediate and adequate relief other then by making the payment, his act is not one done under coercion."

In the present case the defendant had an adequate remedy to avoid paying the disputed portion of the discount to which he claimed the contract entitled him. The construction of the contract with relation to the discount to be allowed on the purchase of Calpet Greenlite gasoline was under dispute by the parties for several months before that product was actually delivered to the defendant. The defendant could have tendered to the plaintiff the portions of the bills which he conceded were due, or he might have paid the disputed portion under protest, and then have brought suit for declaratory relief under the provisions of section 1060 of the Code of Civil Procedure, procuring a restraining order, just as he did on his cross-complaint in this case, to prohibit the plaintiff from refusing to deliver the third grade gasoline pending the trial. In that manner he might have conducted his business without interference while the court proceeded to construe the contract. Under the circumstances of this

case we are of the opinion the defendant may not assert that his payments of the disputed portions of the bills were made under coercion. His payments were voluntary and he therefore waived reimbursement.

For the foregoing reasons we are of the opinion the findings and judgment are not supported by the evidence. The original contract, in our opinion, did not contemplate the sale of the new third grade gasoline in Tulare County, nor did it attempt to fix the rate of discount to be allowed the defendant upon the purchase of that product. If it be assumed that the original contract does cover the Calpet Greenlite gasoline, then, we are of the opinion the subsequent telegrams and letters which cover that subject constitute a modification of the original contract and merge therein the compromise agreement to accept the discount of approximately 1½ cents per gallon on that new grade of gasoline.

The judgment is reversed, and the court is directed to render judgment in favor of the appellant for the sum of $14,835.15, together with accrued interest as prayed for. The court is also directed to vacate the injunction.

Pullen, P. J., and Plummer, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 8, 1937.