[L. A. No. 18845. In Bank. June 29, 1945.]

GRANVILLE MOORE, Respondent, v. THOMAS A. WOOD et al., Appellants.

Thomas A. Wood, in pro. per., and Michael F. Shannon for Appellants.

Cruickshank, Brooke, Dunlap & Ross and Robert H. Dunlap for Respondent.

EDMONDS, J.—By a contract made in 1942, Granville Moore obtained certain rights in connection with the exploration and development of a gold mining property. After less

than a year, the federal government ordered the suspension of all operations of that kind. Later Moore commenced the present action for declaratory relief, asserting that a dispute had arisen concerning the construction of the terms of the contract relating to the responsibility for the cost of maintaining the property during the time the order is in effect. Thomas A. Wood and Ann Wood, the owners of a part interest and lessees of the remaining interest in the mine, have appealed from a portion of the judgment requiring them to pay 49 per cent of the maintenance expenses, and the question for decision concerns the scope and effect of the contract between the parties.

The agreement in controversy provides that as Moore "desires an option to acquire a 51% interest" in the mining property, he shall, not later than February 16, 1942, take possession "and commence the mining operation in the mine located upon said real property known as the Governor Mine, and will thereafter continuously operate said property and develop the same, expending thereon such moneys as may be necessary properly to develop said mine, estimated at $25,000.00 and will place said mine on production within a period of twelve months from the date hereof, provided that delays are not incurred by reason of strikes, lockouts, governmental regulations or any other causes beyond the control of [Moore], and in the event that [Moore] should be delayed in placing said mine on production within said period of twelve months by reason of such cause or causes, then said twelve months' period shall be extended to cover such period of time as [Moore] shall be unable to work said mine. 2. [Moore] will carry on said work in a miner-like fashion and pay for all labor, insurance premiums, power and utility bills, all materials purchased, supplies used, and all other expenses of such work so as to develop the greatest possible tonnage of ore consistent with good work and proper development, working not less than ninety man shifts per month. . . . 4. . . . all [net] profits made shall be divided 49% to the [Woods] and 51% to [Moore], such division to be made through the instrumentality of the corporation next specified, if created. 5. The [Woods] will, at any time that [Moore] elects, convey title to . . . a corporation to be formed under the laws of the State of California . . . having a Board of five directors and with a capital stock structure . . . which . . . shall be issued as follows: 49% thereof to the [Woods]

or their nominees and 51% thereof to [Moore] or his nominee. The determination to create a corporation . . . shall rest with [Moore]. . . ."

The evidence shows, without conflict, that upon the execution of the contract on February 16, 1942, Moore took possession of the mine and during the next five months expended $22,300 in developing it. He also paid the Woods $5,000 as required by the agreement. The mine has been greatly improved by Moore, but he has not realized any return from it.

Prior to July 16, 1942, the material priority regulations issued by the War Production Board were modified to prevent the further procurement of materials essential to mining operations and since that time it has been impossible to operate the property. Moreover, before that date, the continuance of mining operations was prevented by the induction into the armed forces of certain of Moore's irreplaceable and essential employees. Finally, on October 8, 1942, the War Production Board issued an order prohibiting the further conduct of gold mining operations. The land which is the subject of the contract in controversy is valuable only as a gold mining property and the circumstances which have prevented Moore's operation of the property since July 16, 1942, are causes beyond his control.

From the time of the discontinuance of the mining operations to January 10, 1943, when the trial of this suit commenced, Moore expended approximately $2,300 for the protection of the properties against theft, injury, or destruction during the suspension of operations; $1,033.65 of this amount was paid after October 8, 1942, when all gold mining operations were prohibited. The "shutdown" or "standby" expenses will continue at the rate of about $300 per month. In July, 1942, Moore gave the Woods notice that he elected to have the title to the land conveyed to a corporation to be formed in accordance with the provisions of the contract. The Woods refused to comply with his demand.

Upon this evidence, the trial court found that Moore "agreed to place the Governor Mine on production within a period of twelve months from and after February 16, 1942, provided that delays were not incurred by reason of strikes, lockouts, governmental regulations or any other causes beyond the control of" Moore; that he is "excused from placing said mine on production so long as the existing order of the War Produc-

tion Board . . . prohibiting the conduct of gold mining operations is in effect''; also, that he ''is excused from placing said mine on production until the expiration of 130 days'' after the removal of such restriction.

By additional findings, the trial court declared that Moore's obligation to place the mine on production is a personal covenant, and the cost of same ''is to be borne by [Moore] at his sole expense irrespective of the date of formation of the corporation. . . . The true meaning of the words 'on production' is to create net value, and the Governor Mine . . . will be on production only when it is yielding a net return.'' Moore has performed all covenants of the contract entitling him to the formation of a corporation, and the Woods are obligated to join in the execution of articles of incorporation. All expenses incidental to the operation of the mine prior to October 8, 1942, are to be borne by Moore, and those subsequent to that date and until the removal of the governmental prohibition of gold mining, shall be paid by the corporation to be formed.

Upon repeal of the War Production Board order, the cost of operating the mine will become the personal obligation of Moore, until such time as the mine is placed on production; from that time on, the operating expenses shall be borne by the corporation. But if the mine is not put on production at Moore's cost and expense within 130 days from the date of revocation of the governmental prohibition, the Woods will become entitled to terminate Moore's right to an interest in the property.

By the judgment the Woods are ordered to immediately join with Moore in the formation of a corporation, and to transfer their interest in the mining properties to the corporation. Moore is required to pay the expenses necessary to place the mine on production within 130 days after the termination of the War Production Board order prohibiting gold mining operations, and thereafter the cost of operations is to be paid by the corporation.

The appeal of Wood and his wife is from those portions of the judgment by which the corporation is ordered to ''bear the expense of maintaining said property, to-wit: the expense of insurance, services of watchmen, power bills, taxes, utility charges and other expenses of safely keeping the personal property aforesaid and preventing damage to and theft from the Governor Mine . . . so long as there shall be in effect that

certain order of the War Production Board in effect October 8, 1942, or any other valid order by a government agency having jurisdiction in the premises prohibiting the conduct of gold mining operations''; also specified in the notice of appeal is the provision of the judgment wherein it is ordered that unless the Woods ''pay to Granville Moore 49% of the sum of $1,033.65 in cash, and 49% of the amounts expended by him in safely keeping said property since January 10, 1943, [Moore] shall cause the corporation to set up on its books of account a liability to said Granville Moore the sum of $1,033.65 plus such sums of money as said Granville Moore has expended since January 10, 1943, for the purpose of safely keeping said Governor Mine.''

Only insofar as the findings include a construction of the contract in controversy do the appellants challenge the sufficiency of the evidence to sustain them. But in asserting that they are not obligated for any part of the shutdown expenditures, the appellants say that ''the questions of law involved here are simple and have only to do with the general principles governing the construction of contracts.'' Properly construing the contract from its four corners and as a whole, they contend, it clearly appears that Moore's obligation under the agreement to pay all expenses necessary to place the mine on production includes the payment of any expenditures incurred during shutdown periods. Also, they assert, the parties had in mind operational suspensions of the very nature here involved, for the contract provides that the one-year period in which the mine had to be put on production at Moore's expense was to be extended to cover any delays occasioned by reason of ''strikes, lockouts, governmental regulations or any other causes beyond the control of'' Moore. In the event any such delays are incurred, the appellants add, the contract does not provide for the suspension of Moore's obligations during such time. Summing up their attack on the judgment, the Woods complain that under these circumstances, the trial court has written into their agreement obligations, additional to those assumed by them, as follows: ''First, a paragraph placing the burden of the expense of maintaining the property during the period of Government interference upon the corporation that was to be formed; second, a paragraph placing the expense subsequent to October, 1942, and prior to January 10, 1943, on the parties to the contract.''

In support of the judgment in his favor Moore contends that, in construing the agreement between the parties, the trial court correctly interpreted the contract term ''governmental regulations'' as not including an entire prohibition. In this connection, he asserts, ''by the great weight of authority the words 'regulate' and 'regulation' do not include the concept of 'prohibit' or 'prohibition'.'' Accordingly, as the War Production Board order was a prohibition not within the contemplation of the parties when they contracted, from the effective date of such governmental prohibition the parties incurred duties and liabilities ''closely analogous'' to those existing between tenants in common, whereby he is entitled to a proportionate contribution from the Woods for standby expenses paid by him. And, assuming for the purposes of argument that the meaning of the contract is doubtful, the trial court's construction must be adhered to even though as an original proposition another interpretation is equally tenable. In conclusion, Moore asserts that to interpret the contract as placing upon him the entire burden of the shutdown costs during the existence of the governmental prohibition would result in the unjust enrichment of the appellants.

As the issues are presented upon appeal, therefore, the determinative question is whether, in anticipating delays occasioned by ''governmental regulations'' and during which times Moore might be ''unable to work'' the mine, the parties at the time they contracted contemplated a shutdown caused by a governmental prohibition of gold mining.

Implicit in the judgment of the trial court is the determination that the contract obligates Moore to pay all maintenance expenses incurred during periods of delay in which he is unable to work the mine by reason of ''governmental regulations'' beyond his control. The orders of the War Production Board made prior to October were regulations of that kind, and he must, therefore, pay all of the cost of maintaining the property up to the date when gold mining was prohibited. Also, as the regulations in effect between July and October were within the contemplation of the parties when they contracted, Moore may not rely upon the doctrine of impossibility of performance to excuse his delay in placing the mine upon production by the date fixed in the contract. On the other hand, the order suspending gold mining operations was not a ''governmental regulation'' within the contempla-

tion of the parties; Moore is not obligated, therefore, to pay shutdown expenditures incurred subsequent to October 8, 1942. The suspension of gold mining operations created a condition beyond Moore's control, and constitutes a delay caused by operation of law, excusing performance by him.

Since Moore has not appealed from the judgment and the Woods do not challenge the portion of it which requires him to bear all maintenance expenses incurred during such times as he is "unable to work" the mine "by reason of strikes, lockouts, governmental regulations or any other causes beyond [his] . . . control," it follows that the obligations of the litigants must be determined in accordance with that construction of their contract. Certainly the judicial interpretation of an agreement binds the parties to the extent that they do not attack the determination by appeal from the judgment construing the provisions in controversy. The practical interpretation of a contract by the parties constitutes cogent evidence of intent (*Roy* v. *Salisbury*, 21 Cal.2d 176, 184 [130 P.2d 706]; *Tanner* v. *Title Ins. & Trust Co.*, 20 Cal.2d 814, 823 [129 P.2d 383]; *Commercial Discount Co.* v. *Cowen*, 18 Cal.2d 610 [116 P.2d 599]); and the doctrine of res judicata applies to those portions of a judgment which have become final.

Accordingly, although the parties did not expressly provide for the payment of maintenance expenses, by the determination of the trial court, which has now become final, Moore is responsible for the expenses incident to the care of the property during the time that the effective working of the property is delayed by "governmental regulations" beyond his control. Moore argues that there is a difference between the regulations of the War Production Board in effect prior to October 8th and the order suspending gold mining which was promulgated on that date. But although the earlier restrictions worked more indirectly, they effectively stopped the development of the mine; indeed, the findings of the trial court are that on July 19th, Moore closed down the mine due to causes beyond his control.

The challenged portion of the judgment, construing the contract as not imposing upon him the sole liability for maintenance expenses during the pendency of the October 8th order, is not conclusive upon this appeal as Moore contends. The record includes no evidence offered or received for

the purpose of showing the intention of the parties as to their agreement, therefore, the construction of the contract by the trial court presents a question of law which this court must determine. (*Estate of Platt*, 21 Cal.2d 343, 352 [131 P.2d 825]; *Moffatt* v. *Tight*, 44 Cal.App.2d 643, 648 [112 P.2d 910]; *Mitchel* v. *Brown*, 43 Cal.App.2d 217, 222 [110 P.2d 456]; *Texas Co.* v. *Todd*, 19 Cal.App.2d 174, 185 [64 P.2d 1180].) ▮ Considering the contract from that standpoint, as there is no contention that the order of October 8th was promulgated for the purpose of permanently prohibiting gold mining, according to the part of the judgment which has now become final, it is a "governmental regulation" within the meaning of that term as used by the parties.

▮ Moore attempts to distinguish the regulations in effect prior to October 8th and the order which the War Production Board issued on that date by arguing that the prohibition of an act is something quite different from a regulation concerning it. In this connection, he reasons that as a legislative delegation of power does not include the right to prohibit the doing of the act which is the subject of the enactment, he is not obligated to pay all maintenance expenses during the time mining operations are suspended by the federal order. But the rule by which delegation of legislative power is to be measured is of little aid in determining the intention of the parties under the circumstances shown by the record now before the court. To apply it here would require a construction of the term "governmental regulation" without reference to its context which clearly shows the purpose for which it was used. ▮ The meaning of a written instrument is not to be determined by isolating one term used by the parties and defining it without reference to other language of the contract. (*Skookum Oil Co.* v. *Thomas*, 162 Cal. 539, 547 [123 P. 363]; *Culley* v. *Cochran*, 17 Cal.App.2d 498, 502 [62 P.2d 168].) On the contrary, for the purpose of ascertaining the intention of the parties, their agreement must be construed as a whole, so that when read together all of its provisions may be given effect. (Civ. Code, § 1641; *Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 760 [128 P.2d 665]; *Ghirardelli* v. *Peninsula Properties Co.*, 16 Cal.2d 494, 496 [107 P.2d 41].) ▮ As so read, no sound basis exists for making any differentiation between a "governmental regulation" which prevented Moore from obtaining materials without which the mine could not be worked and a

"governmental regulation" which suspends mining operations for an indefinite period.

Finally, the doctrine of impossibility does not give Moore the right to charge the Woods with any part of the maintenance expenses. By their agreement, the parties contemplated that there might be a period or periods of time during which Moore could not, for reasons beyond his control, continue mining operations. If and when such a condition arises, the contract reads, the time within which the mine shall be placed on production is to be extended. But the right to such an extension does not relieve him from the obligation to pay maintenance expenses. Moore admits that, under the terms of his contract, he must develop the mine "at his sole risk and expense," and there is no merit to his contention that the Woods will be unjustly enriched in the event he is required to pay the cost of maintaining the property during the time he is unable to work it.

Those portions of the judgment appealed from are reversed, with directions to the trial court to substitute therefor a determination that by the terms of the contract of the parties dated February 16, 1942, Granville Moore is liable for all maintenance and safekeeping of the property known as the Governor Mine during the time that the order of the War Production Board suspending gold mining operations has been, and continues to be, in effect, or there is in effect any other order by a governmental agency having jurisdiction in the premises suspending such operations.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent. I cannot agree with the result reached in this case. Moore entered into an agreement with the Woods in which he agreed to develop a gold mine within twelve months. The Woods were lessees of the mine. Moore was also to pay $5,000. The agreement estimated the necessary development expenditures to be $25,000. At any time at Moore's request a corporation was to be formed to take over the mine in which he was to have a 51 per cent interest and the Woods, the balance. Moore entered into possession of the property, paid the $5,000, and diligently prosecuted development work, expending $22,300. Although the mine had not reached a "production basis" further operations by

Moore were prevented by conditions beyond the control of either him or the Woods. The sole issue presented is whether the expenses of safeguarding the property during the period that development was prevented should be borne by Moore, the Woods or by both in proportion to their interests. The solution of that question depends upon the interpretation of the contract and the application of equitable principles.

First, the contract properly interpreted is wholly silent on the foregoing issue. It provides that Moore shall "continuously operate said property and develop the same, expending thereon such moneys as may be necessary properly to develop said mine, . . . and will place said mine on production within a period of twelve (12) months from the date hereof. . . ." The foregoing clause is qualified by the immediately following proviso "that delays are not incurred by reason of . . ., governmental regulations or any other causes beyond the control of the party of the second part, and in the event that the said party of the second part should be delayed in placing the said mine on production within said period of twelve months by reason of any such cause or causes, *then said twelve months' period shall be extended to cover such period of time as said party of the second part shall be unable to work said mine.*" *Hence, Moore's time was extended* by the terms of the agreement. The only other clause in the agreement dealing with Moore's obligation to make payments or assume duties with respect to the mine is the paragraph immediately following the above-quoted excerpts. It provides that Moore "will carry on *said work* in a miner-like fashion and pay for all labor, insurance premiums, power and utility bills, all materials purchased, supplies used, and all other expenses of *such work* so as *to develop* the greatest possible tonnage of ore consistent with good work and proper development, working not less than ninety (90) man shifts per month." The words "said work" and "such work" can refer only to *development and operational work.* That is the only type of work referred to in the foregoing part of the agreement and must be that to which reference is made in the last-quoted paragraph. Certainly work of that character aimed toward putting the mine on production does not include expenses for preservation of the property when because of unforeseen events *the development and operation of the mine is prevented.* The very work which Moore assumed the obligation to perform was prevented. How then may it be said that he was doing such work in

merely preserving the property. Therefore, we have a situation in which neither Moore nor the Woods have assumed by the contract the obligation for the maintenance expenses while the mine cannot be operated.

Second, principles of equity, restitution and unjust enrichment require that the expenses be borne by the Woods and Moore in proportion to the interests they are to have in the partnership or corporation which is to operate the property. The following factors are of importance. The possessory right to the mine and the minerals and some of the equipment used in its development belong to the Woods. It is their property which must be preserved during the interval that work is prevented. Moore has paid $5,000 and expended $22,300 in the development of the mine. He has performed all of the terms of the agreement to be by him performed. Through no fault of his he is faced with the problem of being unable to proceed with the development work, and the necessity of preserving the mine and equipment in order that he will not lose the efforts and outlays already expended. Both he and the Woods have an interest in having that property preserved in order that it may be placed finally on a production basis to their mutual benefit. By analogy the following rule should apply. ''Where two persons are tenants in common or joint tenants and one of them has taken reasonably necessary action for the preservation of the subject matter or of their common interests, he is entitled to indemnity or contribution, enforced by means of a lien upon the interest of the other (a) if he made a request to the other to join in such preservation, or (b) without such request, if action was immediately necessary and the other was not available.'' (Rest., Restitution, § 105.) (See, also, Rest., Restitution, § 117.) Also Moore and the Woods may be considered as joint adventurers. The Woods furnished the mining property. Moore was to develop it paying the expenses thereof. A corporation or partnership was to be formed to operate the mine. The interests in the produce from the mine were expressly apportioned, and when it became a producing mine the profits and losses were to be divided. A joint adventure has been defined as ''a joint association of persons in a common enterprise for profit, but falling short of a partnership. . . .

''To illustrate: a joint adventure exists where a furrier agrees with a merchant to devote his labor and skill in manufacturing fur garments, the other to furnish the capital, sell

the goods and pay the furrier a proportion of the net profits and a salary for his services; in such case the furrier has not the usual power of a partner to bind the firm. So also it has been held that there is a joint adventure where one agrees to devote his services to securing fruit to be marketed by the other on an equal division of the profits and losses; where two persons agree to make a purchase of grain and to share the profits and losses; where several persons associate themselves together to promote a race for profit; where two persons agree to operate an apartment house on shares for a limited time; and where several persons purchase an interest in a mine and operate it, not for ultimate profit, but as a means of paying the balance of the purchase price.'' (14 Cal.Jur. 760.)

The trial court determined that the expense of safeguarding the property during the period of enforced suspension of operations should be borne by Moore and Woods in proportion to their respective interests in the property. In my opinion this is an equitable division, and the judgment should be affirmed.

Schauer, J., concurred.