[S. F. No. 10461. In Bank.—September 10, 1924.]

JOS. ROSENBERG et al., Respondents, v. GEO. A. MOORE
& CO. (a Corporation), Appellant.

[1] Verdict—Juries and Jurors—Impeachment.—The verdict of a
jury cannot be impeached by the affidavits of jurors showing mis-
conduct on the part of any member of the jury, except where the
verdict is reached by a resort to the determination of chance;
nor can a verdict be impeached by the hearsay statements of
jurors regarding such misconduct.

[2] New Trial—Evidence — Discretion — Appeal. — The action of a
trial court in granting or denying a new trial for insufficiency
of evidence is conclusive on appeal, unless there has been an
abuse of discretion; and if there is a substantial conflict in
the evidence, the trial court will not be deemed to have abused
its discretion when it has determined that the verdict or the find-
ing is against the weight of the evidence and that there should
be a new trial. When the evidence is conflicting, the trial court
is authorized to review it, and if, in its opinion, the verdict is
against the weight of the evidence, it is its duty to grant a new
trial.

[3] Id. — Order Granting New Trial — Appeal — Presumption.—In
considering the question of the correctness of an order granting
a new trial the presumption on appeal is in favor of the order
and against the verdict.

[4] Sales — Sale of Wiping Rags — Construction of Contracts. —
The parties to several contracts for the sale and purchase of rags
to be shipped from a European city having had in mind at the
time of the execution of such contracts the purchase and sale of
wiping rags, assuming, as the seller contends, that when the
buyers contracted to buy wiping rags of a certain description
to be shipped from said European city, the contract was per-
formed by the seller when it furnished wiping rags answering
the description specified in the contract according to the stand-
ards of the European market, still from such assumption it would
not follow that the contracts would be performed by the furnish-
ing of merchandise which was something other than wiping rags.

[5] Id.—Action by Buyers for Money and Damages—General Ver-
dict—Evidence—New Trial—Discretion.—In an action by the
buyers against the seller for money and damages arising from the
alleged failure of the latter to deliver the kind of rags contracted
for, notwithstanding the fact that the verdict for the seller was

1.  See 8 Cal. Jur. 436; 27 R. C. L. 896, 898.
2.  See 20 R. C. L. 226.

a general verdict and that in its deliberations the jury may have
balanced the claims of the parties except as to the amount of
the verdict, if there was sufficient evidence before the jury to
sustain a verdict for the plaintiffs, either on the complaint or as
against the cross-complaint, then it was within the province of the
trial court to weigh that evidence and give it the force and effect
to which it was entitled, and in doing so be free from the charge
that it had abused its discretion in deciding the motion for a
new trial in favor of the plaintiffs.

[6] Id.—Conduct of Parties Under Former Contract—Competency
of Evidence—Practical Construction.—In such action, the con-
duct of the parties under a former contract identical in form
with that involved in this action, dealing with the right of plain-
tiffs to a refund of moneys paid for rags other than wiping rags,
and involving a time when the relations of the parties were
harmonious, was competent evidence of the intention of the
parties under the subsequent contracts, and there is much force in
the suggestion of plaintiffs that the court should give much weight
to that practical construction placed upon the subsequent con-
tracts by the parties themselves.

[7] Id.—Letters—Modification of Original Contract of Parties.—
In such action, letters written after a controversy arose as to the
scope of the contracts in suit and embodying a definite proposal
on the part of the plaintiffs that the rags should be sorted, and
that the rags which were not wiping rags should be rejected and
an acceptance of said proposal by the defendant with the under-
standing that the refunds would be made after the invoices had
been paid, constituted to the extent therein provided a modifica-
tion of the original contracts.

[8] Id. — Evidence — New Trial — Discretion. — In such action, the
weight to be given the evidence was in the first instance for the
jury to determine, and in the second instance it was to be con-
sidered and determined by the trial court on the motion for a
new trial; and in view of the proper instruction of the jury and
in view of the evidence, including the many declarations and ad-
missions of the defendant as to the kind of rags shipped, it can-
not be said that the trial court abused its discretion in granting
the motion for new trial.

---

6.  See 6 Cal. Jur. 304; 6 R. C. L. 852.
7.  See 6 Cal. Jur. 372; 6 R. C. L. 914.

(1) 29 Cyc., pp. 982, 988.  (2) 4 C. J., pp. 833, 834, sec. 2816; 29
Cyc., p. 821.  (3) 4 C. J., p. 782, sec. 2733.  (4) 35 Cyc., pp. 218,
220.  (5) 29 Cyc., p. 1009.  (6) 13 C. J., p. 549, sec. 517; 35 Cyc.,
p. 98.  (7) 13 C. J., p. 590, sec. 605; 35 Cyc., p. 124.  (8) 4 C. J.,
p. 834, sec. 2816; 38 Cyc., p. 1516.

APPEAL from an order of the Superior Court of the City and County of San Francisco granting a new trial. E. P. Shortall, Judge. Affirmed.

The facts are stated in the opinion of the court.

Ira S. Lillick and Theodore M. Levy for Appellant.

Brownstone & Goodman for Respondents.

SHENK, J.—This is an appeal by defendant from an order granting a new trial after verdict in its favor and against the plaintiffs on its cross-complaint. In February, March, and April, 1921, the parties hereto entered into nine separate contracts, wherein the plaintiffs agreed to buy and the defendant agreed to sell approximately 1000 tons of wiping rags for a price aggregating over $100,000. Both parties were doing business in San Francisco and the merchandise was, under the contracts, to be shipped from Antwerp, Belgium. A portion of the goods was received by the buyer and paid for. The balance was rejected. The complaint is in twelve counts, which fall within three general classifications. The first three are for damages for alleged breach of warranty, the fourth is for money had and received, and the following eight are for damages arising out of the alleged failure of the defendant to deliver to the plaintiffs wiping rags as agreed. The total amount prayed for in the complaint is $48,357.81. The defendant answered, admitting the execution of the contracts, but denying generally and specifically the alleged breach and failure to deliver. The defendant then set forth twelve causes of cross-complaint as to matters involved in the complaint. These several causes of cross-complaint fall within two general classes. Each of the first three is on a promissory note in the sum of $2,000 alleged to have been executed by the plaintiffs and delivered to the defendant. The remainder are for damages alleged to have been suffered by the defendant by reason of the alleged failure of the plaintiffs to receive and pay for wiping rags as agreed. The total amount sought to be recovered by the cross-complaint is $36,401.07. After trial before a jury a verdict was rendered in favor of the defendant and against the plaintiffs for the sum of

$8,331.25, which included $6,000 on account of said promissory notes, $372.15 interest thereon and $1,959.10 for expenses incurred by the defendant in disposing of the rejected goods in the open market.

The plaintiffs specified nine grounds in their motion for a new trial, but three only are stressed upon the appeal, namely, (1) irregularities in the proceedings of the jury by which the plaintiffs were prevented from having a fair trial, (2) misconduct of the jury, and (3) insufficiency of the evidence to justify the verdict. The motion as to the first two was based on affidavits and as to the third was made on the minutes of the court. The moving affidavits were made by two jurors and related to remarks and conduct on the part of two other jurors during the course of the trial and while the jury was deliberating on the verdict. The first affidavit states that during the course of the trial and while the jurors were seated in the jury-box another juror said that the contracts between the parties "settled the case and he was satisfied that Rosenberg had not the right to inspect the rags, and shouldn't recover," and "that Rosenberg was trying to run out on his contract"; that the affiant heard another juror say that certain telegrams from the defendant to Alfred Heymann offered in evidence "did not mean anything, and were of no consequence," and when plaintiffs' attorney made a statement concerning a mistake in computation the second juror said: "That's Yiddish addition"; that during the deliberations on the verdict, the juror whose remarks were first related said that "the case did not need to last five minutes so far as I was concerned; after the contracts were in, that settled the case for me"; that when the jury retired the two jurors whose conduct was criticised were the foremost champions of the defendant's rights to recover and that one of them raised his voice in a loud and boisterous manner, "apparently attempting to coerce the jurors into accepting his views." The affidavit of the other juror added nothing to the former and is open to the objection that the statements made by the affiant were hearsay. Counter-affidavits were filed on behalf of the defendant but the showing made by the moving affidavits was clearly insufficient to warrant the granting of the motion. [1] No fraud was charged and there was no showing that the verdict was reached by a resort to the determination of chance. In

*People* v. *Findley,* 132 Cal. 301 [64 Pac. 472], it was said: "It is the settled law of this state that the verdict of a jury cannot be impeached by the affidavits of jurors showing misconduct on the part of any member of the jury, except where the verdict is reached 'by a resort to the determination of chance.' (Code Civ. Proc., sec. 657.) Nor can a verdict be impeached by the hearsay statements of jurors regarding such misconduct (*People* v. *Azoff,* 105 Cal. 632 [39 Pac. 59])."

The minutes of the court show the following: "It is ordered that said motion for a new trial be and the same is hereby granted upon all the grounds set forth in said motion, and particularly upon the ground that the evidence is insufficient to sustain the verdict." Inasmuch as the court specified in its order that the motion was granted upon the ground that the evidence was insufficient to sustain the verdict, the only question remaining concerns the correctness of the order made on that ground. It has therefore become necessary to examine the record in order to determine what evidence, if any, would support the ruling of the court, having in mind the rules governing such examination and determination. These rules are well established. **[2]** In *Gordon* v. *Roberts,* 162 Cal. 506 [123 Pac. 288], it was said: "This court has frequently commented upon the wide extent of the discretion of the trial court in granting or denying a new trial for insufficiency of evidence. 'Its action,' as was said in *Domico* v. *Casassa,* 101 Cal. 411 [35 Pac. 1024], 'is conclusive upon this court, unless there has been an abuse of discretion.' And, if there is a substantial conflict in the evidence, the trial court will not be deemed to have abused its discretion when it has determined that the verdict or the finding is against the weight of the evidence, and that there should be a new trial. 'When the evidence is conflicting, the trial court is authorized to review it, and if, in its opinion, the verdict is against the weight of evidence, it is its duty to grant a new trial.' " (*Merralls* v. *Southern Pac. Co.,* 182 Cal. 19 [186 Pac. 778]; *Biaggi* v. *Ramont,* 189 Cal. 675 [209 Pac. 892]; *Soto* v. *Globe Grain & Milling Co.,* 55 Cal. App. 532 [203 Pac. 830].) **[3]** In considering the question of the correctness of the order the presumption on appeal is in favor of the order and against the verdict (*Marr* v. *Whistler,* 49 Cal. App. 364 [193 Pac. 600]; *Roberts*

v. *Southern Pac. Co.*, 54 Cal. App. 315 [201 Pac. 958]).
With these rules in mind, the record has been examined
with a view to determining whether it can be said that the
trial court abused its discretion in granting the motion.

It would be impracticable and unnecessary to undertake
an extensive review of the evidence which is contained in
a voluminous record. Only those portions, either contro-
verted or admitted, which tend to support the order ap-
pealed from will be adverted to.

The plaintiffs were manufacturers and dealers in wiping
rags in San Francisco and the defendant was engaged, at
least in part, in the importing business in said city. A wip-
ing rag is described in the evidence as a soft cloth of cotton
or wool, or both cotton and wool, having absorbent qualities
which make it useful in wiping machinery of all kinds,
printing-presses, windows, etc. It is made from cast-off
articles of clothing and rejected fabrics usually gathered in
the first intance by rag-pickers and cut sufficiently large
to serve the purpose for which it is intended. The negotia-
tions which resulted in the contracts in question were car-
ried on between Jos. Rosenberg, representing the plaintiffs,
and A. Juell, representing the defendant. These men had
been acquaintances for many years. The defendant had
imported large quantities of roofing rags from Europe.
In February, 1921, Rosenberg suggested to Juell that in-
asmuch as the defendant was importing roofing rags it
might also be able to import wiping rags. Acting upon
the suggestion Juell cabled to European clients of his firm
and in a few days reported to Rosenberg that he had prices
from two different concerns, the price of one being con-
siderably higher than the other. Neither Rosenberg nor
Juell at that time knew anything about European wiping
rags so they agreed to order a quantity from each concern
and determine upon arrival which one furnished the better
goods and which one was the more reliable concern, all as
a basis for possible additional orders in the future. These
two shipments were referred to in the evidence as the Hey-
mann & Co. and the Van der Haege shipments, the former
being the more expensive merchandise. Before these ship-
ments arrived Juell told Rosenberg that because of the un-
satisfactory conditions of exchange it would be advisable
for him to order more wiping rags from Heymann & Co.,

and that he would be taking no chances because Heymann & Co. was a responsible firm. As a result of this conversation additional contracts covering 325 tons of wiping rags were executed. When the first order arrived, early in April, 1921, the goods were received and paid for by the plaintiffs. Upon inspection it was found that the Heymann shipment contained satisfactory wiping rags but that the Van der Haege shipment contained a large percentage of roofing rags or shoddy rags, that is, rags not usable as wiping rags. As to the latter shipment the parties agreed that the plaintiffs should grade the same and be allowed for rejections. Accordingly the merchandise was taken to the plaintiffs' warehouse and sorted and the plaintiffs were allowed the sum of $841.40 on account of the portion of the Van der Haege shipment that did not constitute wiping rags. After the plaintiffs' inspection of the Heymann & Co. portion of the first shipment plaintiffs ordered, under contracts dated April 19, 1921, approximately 550 tons of wiping rags with the understanding that they should come from Heymann & Co.

The contracts were in similar form. They referred to the parties hereto as the seller and purchasers, that shipment should be by "prompt steamer from Antwerp to San Francisco"; the quantity and the price were definitely stated and it was provided that payment should be "net cash as soon as documents arrive at San Francisco, i. e., prepaid steamer bill of lading Antwerp to San Francisco, consular invoice, weight list and bill of health certificate." The descriptions of the merchandise were as follows: Contract number 249, "dark and light wipers"; contract number 250, "light, dark, fine and light print wipers"; contract number 256, "washed and trimmed dark and light wipers in bales"; contract number 259, "washed and trimmed heavy dark cottons and linsey wipers in bales"; contracts numbers 260 and 266, "washed and trimmed white wipers in bales"; contract number 264, "washed and trimmed light wipers in bales"; contract number 265, "dark (heavy and light mixed) washed and trimmed wipers in bales"; and contract number 267, "ordinary light unwashed wipers in bales."

After the examination of the first shipment and after contracts had been executed for the additional tonnage, but

before the arrival of the latter, Rosenberg learned that a shipment of wipers had arrived in San Francisco from Heymann & Co. to Charles Harley Company. Rosenberg testified that he inspected them and found that there were very few wiping rags among them. He communicated with Mr. Juell and stated to him that if the Heymann & Co. rags which he had bought were anything like those received by the Charles Harley Company he would reject them. Shortly thereafter Juell informed Rosenberg that he had cabled Heymann about the rags and had received a reply in which Heymann had stated that the wipers which had been shipped were all good wipers but that if the matter was serious he would come to San Francisco. On cable advice from Juell he came to San Francisco, arriving about the time of the arrival of some 200 tons of the merchandise which had been shipped by him on the steamer "Transvaal" intending the same to be in fulfillment of certain of said contracts. For these goods the plaintiffs paid defendant the sum of $17,433.35 upon presentation of the documents as required by the contracts. This shipment was hauled to the warehouse, where it was inspected by Juell, Heymann, and Rosenberg. Heymann was shown his first shipment, which was satisfactory to all parties concerned and, referring to the same, stated that that was the way he always packed wiping rags. During the inspection of the "Transvaal" shipment he admitted that numerous articles taken from the bales were not wiping rags and should not be included therein. He stated that he had not packed the "Transvaal" shipment but that the same had been packed by different packers. As to what further took place during that inspection Rosenberg testified as follows: "I told Mr. Juell then, in the presence of Mr. Heymann, who was also present at the same time, at that same conference, that I absolutely would not accept the rags unless Mr. Juell would relieve me definitely of all responsibility in connection with the rejections—that we had intended to sort out and grade out all of these wipers, that we would charge him back with all the labor, and that we would only keep the rejections at what we could sell them for, and that I would have to have that in writing with Mr. Juell. And I told him that I intended to embody this in a letter at once, and forward it to his office, and would expect his reply immediately. Mr. Juell

told me that that was agreeable to him and that he would accept that proposition. I think Mr. Heymann was at our place, altogether, maybe, three-quarters of an hour, and he left rather angrily." Heymann departed almost immediately for New York City. Following the conversation and oral understanding between Rosenberg and Juell, as above outlined, the plaintiffs, under date of July 11, 1921, transmitted to the defendant a letter in which was incorporated the following: "After examination of wiping rags sold by you to us, taken from the steamer 'Transvaal,' with your Mr. Juell, Mr. Heymann, and our Mr. Jos. Rosenberg, we find that after opening several bales, that they contain rags other than wiping rags, and that they are only fit for roofing rags, and can only be used as such by us, and before taking these wipings rags to account, we shall ask you to definitely permit us to sort these wiping rags and reject all such rags that are not fit for wiping rags. We are perfectly willing to hold these rejected rags subject to your order. All shipments now en route from Europe to be governed in the same manner as above outlined, in so far as rejections are concerned." Under date of July 12, 1921, the defendant replied as follows: "We beg to acknowledge receipt of your letter of the 11th inst. and confirm arrangement as outlined by you. Refund for rejects or adjustments of same is to be made by us after our invoices are paid by you in accordance with terms of contract." After these letters had been exchanged the parties became involved in a controversy in advance of the actual sorting of the goods as to the percentage of rejections which would be allowed. Rosenberg testified that the defendant insisted upon a definite percentage, which the plaintiffs refused to consider. The parties thus reached an impassé and the litigation followed.

It is the contention of the defendant that the contracts provided for a definitely described article of merchandise and contained no warranty of quality; that the parties contracted with respect to European wiping rags and that there is no evidence in the record that the wipers delivered and tendered to the plaintiff did not answer the description of European wiping rags. It is urged with great insistence that the plaintiffs having purchased European wiping rags were only entitled to and were bound to accept "wiping rags of the grade, kind, and quality and standard produced in

Europe whether better or worse than that of wiping rags produced in California.'' It is not contended by the plaintiffs, and from the language of the contracts it could not properly be contended, that the defendant expressly warranted the quality of the wiping rags that were purchased, but it is the position of the plaintiffs that the subject matter of the contracts was *wiping rags* and that the contracts contained an implied warranty that the goods would be wiping rags and not shoddy rags or something other than wiping rags. An examination of the record impels the conclusion that what the parties had in mind at the time of the execution of the contracts was the purchase and sale of *wiping rags*. At the time they knew nothing about European wiping rags other than the knowledge which they had gained from an inspection of the first shipment from Heymann & Co. and Van der Haege and it was particularly the merchandise contained in the Heymann & Co. shipment that the parties had in mind at the time the contracts were signed.

[4] It may be assumed, as defendant contends, that when the plaintiffs contracted to buy wiping rags of a certain designated description to be shipped from Antwerp, the contract was performed by the defendant when it furnished wiping rags answering the description specified in the contract according to the standards of the Antwerp market, but from this assumption it would not follow that the contracts would be performed by the furnishing of merchandise which was something other than wiping rags. All of the contracts provided for the purchase and sale of *wiping rags* and such was the clear intention of the parties. Whether the rags shipped by Heymann & Co. were wiping rags according to the European standard or according to the California standard is not determinative. Whether they were wiping rags at all or what proportion thereof was rags other than wiping rags was the issue before the court and jury. This was especially true with reference to the first three causes of action set forth in the complaint. Therein the plaintiffs allege the payment of sums aggregating $39,-623.09 in accordance with the contracts and for which payment wiping rags were thereafter to be delivered; that the rags were delivered but that a large proportion thereof did not constitute wiping rags but were shoddy rags. In these

three causes of action the plaintiffs claimed reimbursement for rejections after the rags had been sorted in the total sum of $16,112.44, and there was evidence to support the claim. The defendant in its answer admitted that the payment of said $39,623.09 had been made in accordance with the terms of the contracts as alleged, but denied that said rags were not wiping rags and alleged that they were European wiping rags as called for in the contracts. The situation is still more directly presented with reference to the "Transvaal" shipment. It was that shipment on which the plaintiffs paid the sum of $17,433.35 in accordance with the terms of the contracts, as alleged in the second cause of action, that is, upon presentation of the documents, and on account of which payment the plaintiffs are claiming the sum of $9,276.86 as having been paid for the rags which were not wiping rags. The three promissory notes, aggregating $6,000, were a portion of said payment of $17,433.35. These promissory notes formed the basis of the three causes of cross-complaint on the part of the defendant and the amounts of which the jury included in its verdict, thus holding in effect that the plaintiffs were not entitled to reimbursement on account of extraneous material, which the evidence showed amounted in some cases to more than ninety per cent of the whole. [5] We are not unmindful of the fact that the verdict was a general verdict and that in its deliberations the jury may have balanced the claims of the parties except as to the amount of the verdict, but if there was sufficient evidence before the jury to sustain a verdict for the plaintiff, either on the complaint or as against the cross-complaint, then it may be said that it was within the province of the trial court to weigh that evidence and give it the force and effect to which it was entitled, and in doing so be free from the charge that it had abused its discretion in deciding the motion in favor of the moving party.

[6] It is contended by the plaintiffs in support of their claim for reimbursement of moneys paid for rags other than wiping rags that it was the intention of the parties at the time of the execution of said contracts subsequent to the trial shipment that they would not be required to pay for any rags that were not wiping rags. It is urged that such intention is manifest by a practical construction placed upon the contracts covering the trial shipments whereby the plain-

tiffs were allowed a refund of $841.40 on account of rags in that shipment which were not wiping rags. This refund was made under date of April 30, 1921, after the last contracts had been executed. Accompanying the remittance was a letter in which the defendant stated to the plaintiffs: "We beg to acknowledge receipt of your favor of the 28th inst., enclosing your invoice amounting to $841.40, covering claim against this shipment for wipers not coming to required quality, and we are enclosing our check in payment of same. As you are aware, you have only paid us 80% of the value of the wipers, amounting to $2,420.99, leaving a balance due us of $605.25 payable on delivery of wipers after inspection, and you will therefore realize that the claim made by you is very heavy. As previously advised you, we are fortunate enough to have on hand $714.13 for account of the suppliers, and to enable us to reimburse you, we will have to pay the difference out of our own pocket and can only hope that we will eventually be reimbursed for this amount by the suppliers. We certainly do not intend in the future to buy any more wipers from this source, unless we have some guaranty as to the quality. . . . "

The defendant contends that the transaction wherein the first refund was made concerned a contract not involved in this action. Plaintiffs reply that the contract there involved was identical in form with those here involved and the statement is not denied by the defendant. We think the conduct of the parties under such former identical contract, and when their relations were harmonious, was competent evidence of the intention of the parties under the subsequent contracts, and there is much force in the suggestion of plaintiffs that the court should give much weight to that practical construction placed upon the subsequent contracts by the parties themselves. The case of *Mitau* v. *Roddan,* 149 Cal. 1 [6 L. R. A. (N. S.) 275, 84 Pac. 145], fully supports that contention. **[7]** Still stronger evidence in support of the plaintiffs' position is that found in the letters exchanged between the parties under date of July 11 and 12, 1921, above quoted. Those letters were written after a controversy arose as to the scope of the contracts and constituted a definite proposal on the part of the plaintiffs that the rags should be sorted, and that the rags which were not wiping rags should be rejected and an acceptance of said proposal

by the defendant with the understanding that the refunds would be made after the invoices had been paid. To the extent therein provided we think those letters constituted a modification of the original contracts. That they were intended to accomplish what they purport to cover, as plaintiffs contend, is evident by what occurred during the few days immediately following.

On July 13, 1921, Juell telegraphed Heymann en route eastward as follows: "It is very evident that Rosenberg intends making large rejections and frankly we feel that he is more or less justified. We on our part cannot undertake responsibility of adjusting this claim and must for our protection reject shipment. Have cabled your office to this effect and to withhold further shipment pending settlement. Duval Moore suggests it is imperative for you to return here immediately and settle matter as it is assuming much more serious proportions than anticipated when talking with you. From further inspection on the dock this morning there is no question that the wipers are not properly trimmed and there is a considerable portion of the bales which contain rags not suitable for wipers, especially in the darks and heavy light cottons and linsey wipers. Emphatically urge that you do not underestimate the seriousness of the situation and do not hesitate to come back to adjust matter as we feel that the claim can be minimized by settling now rather than later." Two days later the defendant telegraphed Heymann at Buffalo as follows: "Answering your night letter from train, our opinion has not changed as we were convinced Rosenberg had a just claim. The only change was that when you left hurriedly we did not realize serious proportions it might assume. Our view was changed by a more thorough inspection of goods ex 'George Washington' and 'Transvaal,' and we could see that there was quite a proportion which could reasonably be objected to. However, there is no need of arguing *pro* and *con* as you agree to stand behind us in allowance we will have to make. We are arranging to have competent surveyor inspect shipment and experienced man supervise sorting. Rosenberg has rejected entire shipment, and we have arranged more particular inspection Saturday and will wire you result." Under date of July 19, 1921, the defendant telegraphed Heymann at New York City as follows:

"Supplementing our night letter to Statler Hotel, Buffalo, July 15th survey delayed until this morning. Juell Duval Moore and representing us surveyor Seale Chief Storekeeper of Union Works and contractor for cleaning tankers here twenty-five years standing together with Rosenberg and two friends of his opened several bales of heavy dark cottons and linseys one bale of dark wipers one bale of light wipers. Each and every piece was thoroughly sorted out and examined. Our experts agree that the heavy dark cottons could not be justified as wipers before any court, and that the rejections which could be justified would run over seventy-five per cent more nearly eighty to ninety. The bale of dark wipers segregated almost thirty per cent throwouts about which there might be discussion on account of lack of trimming of some pieces but balance overalls, corduroy clothing, carpets, et cetera same as heavy dark cottons. . . . All of above approximations are made without taking into consideration the cost of sorting which Rosenberg rightly claims should not be for his account, . . . It is our honest opinion that Rosenberg could without question make his rejection stick in any court or arbitration as to the heavy and heavy and light mixed wipers, and we believe it would be a very close question whether we could prevent his valid rejection on the light and dark wipers. We feel that every effort should be made to conciliate him. . . . " Later on in the latter part of July an inspection of rags was made by representatives of the parties in the presence of Juell, Moore, and Rosenberg. One bale of rags from the "Transvaal" shipment was graded at that time. It weighed 480 pounds and in the entire bale there were eighty pounds of wipers. The balance was shoddy. Another bale was graded which weighed 500 pounds and contained 40 pounds of wiping rags. Rosenberg testified that at the close of that inspection Moore said to him: "There is no question, Rosenberg, that you have a claim, and if we can get together on a reasonable claim, I will get in touch with Heymann and see what I can get Heymann to allow us, and I will make an allowance and try to get this thing cleared up quickly."

We therefore have in the evidence in support of the ruling of the court numerous contracts, all providing for the purchase and sale of *wiping rags;* a practical construction placed thereon by the parties that the plaintiffs would not be

required to take without reimbursement therefor the materials in the several shipments which did not constitute *wiping rags;* the statements of Heymann, the European shipper of the merchandise, in the presence of both parties, with no contradiction thereof, that there was material therein which did not constitute wiping rags and which was, in effect, an admission that the rags shipped by him were at least in part not wiping rags under European standards; a cablegram from the defendant to Heymann advising the latter of the presence in portions of the shipment of as high as ninety per cent of rags that could not be justified as wipers and acknowledging the justice of the plaintiffs' claim on account of rejections; the exchange of letters between the parties amounting to a modification of said contracts in providing for a refund to plaintiffs on account of rejected rags, and the telegrams from defendant to Heymann further admitting the validity of plaintiffs' claim.

[8] As an indication of the views of the trial court on the question of the proper construction of the contracts the jury was instructed: "That it was the duty of the defendant to deliver to the plaintiffs rags answering the description named in the contract, to wit, wipers, i. e., rags suitable for wiping purposes"; also, "that it is generally the accepted rule of law that on a sale of personal property as being of a particular kind or description stated as a fact in the contract, there is an implied agreement that the article sold is of that kind or description, and the description is thereby warranted. . . . You are instructed that under the terms of said contracts it was the duty of the defendant to deliver to plaintiff rags suitable to the purposes for which they' were sold, i. e., rags such as described in the contracts must be suitable for wiping purposes." The defendant admits and declares that the jury was properly instructed. The weight to be given the evidence was in the first instance for the jury to determine. In the second instance it was to be considered and determined by the trial court on the motion for a new trial. In view of the admittedly proper instruction of the jury by the trial court and in view of the evidence, including the many declarations and admissions of the defendant above referred to, it cannot

be said that the court abused its discretion in granting the motion.

The order is affirmed.

Richards, J., Lawlor, J., Lennon, J., Waste, J., Seawell, J., and Myers, C. J., concurred.