[Civ. No. 7237. Third Dist. Aug. 1, 1946.]

LULU K. ENOS et al., Appellants, v. MARY ARMSTRONG et al., Respondents.

Earl D. Desmond, Gerald Wallace and E. Vayne Miller for Appellants.

Richard Belcher and Grayson Price for Respondents.

ADAMS, P. J.—This action was brought by Lulu K. Enos, Anna K. Livingston, Eleanor K. Sanders, Alys K. Walters and Dorothy Keenan (by her attorney in fact) against Mary

Armstrong and Ray Armstrong (her husband), and Rex Keenan, and H. B. P. Carden, executor of the estate of Michael Keenan, deceased. Plaintiffs and defendants Mary Armstrong and Rex Keenan are all children of the deceased Michael Keenan, and equal beneficiaries under his will. The main purpose of the action was to secure a declaration of the rights of plaintiffs under two written leases, the one entered into by H. B. P. Carden, as executor of the Keenan estate, with Mary and Ray Armstrong, and the other with Rex Keenan. The amended complaint was in three counts, only the first and the third being pertinent upon this appeal, as the second appertained to the lease to Rex Keenan, who was in the army and as to whom no trial was had.

The first count of the complaint alleged that Carden, as executor, had, on May 31, 1940, entered into the lease with the Armstrongs, a copy of the lease being attached to and made a part of the complaint. By the terms of said lease the executor leased to the Armstrongs certain real property and a flock of sheep for a term commencing June 1, 1940, and ending May 31, 1941, at an annual rental of $1,475, "plus 288 of the top Rambouillet ewe lambs produced during the year, which shall be added to and become part of the flock of sheep hereinafter referred to. In the event enough Rambouillet ewe lambs are not produced to add this agreed number to the flock, the proceeds from the sale of crossbred lambs shall be used to purchase enough Rambouillet lambs to make up the deficiency." The number of sheep leased is set forth in a subsequent part of the lease as follows:

"During the life of this agreement said lessees shall at all times keep the flock of ewes and lambs up to the number herein leased, i. e. 1440 ewes, 265 lambs and 20 rams, and lessees are to add to the flock each year top Rambouillet ewe lambs in number equal to 288. At the expiration of this lease, lessees are to return to lessor 1705 ewes, 288 ewe lambs and the rams as mentioned herein, less any ewes or lambs which may have been lost by death from no negligence on the part of the lessees, provided that if such loss be so great as to cause the total number of ewes to fall below 1440, lessees must furnish sufficient ewe lambs to bring the total number of ewes up to said 1440 and ewe lambs to 288."

Lessees agreed to assume the expenses incident upon the care of the sheep and to care for them and otherwise handle them and their increase "according to the best methods known to the livestock industry"; they also agreed that "the title

to all of said sheep, the increase and increment therefrom and the wool and lambs produced, shall at all times during the terms of this lease, remain in the lessor and are to be sold in the lessor's name and the money therefrom turned over to the said lessor, who will then adjust with the lessees any payments that may be due to the lessor, under this lease and all advancements made to Mary K. Armstrong.''

The complaint further alleged that defendant had defaulted in the payment of a portion of the rental due under the lease because, at the final termination thereof, they did not return to the estate the number of sheep required under the terms of the lease, and that as a result the assets of the estate were depleted and the estate was damaged; and that defendants Armstrong had failed to maintain and care for said sheep in a proper and husbandlike manner in accordance with the best animal husbandry practices in the community, resulting in additional loss to said estate.

In the third count it was alleged that Carden, as executor, had filed his final account and petition for distribution in the estate of Keenan, and that unless the rights of plaintiffs under the lease to the Armstrongs were determined and the latter compelled to account for their failure to comply with the terms of their lease the estate would be diminished to plaintiffs' detriment. It is further alleged in this count, on information and belief, that the executor has lent monies of the estate to the Armstrongs instead of paying the net income to the beneficiaries under the terms of the will of Michael Keenan, and they request a declaration of their rights under the said will. The substance of the prayer of the complaint is that the rights and duties of the respective parties be declared under the lease and the will, and that the Armstrongs be ordered to pay damages to or make restitution to the estate for their failure to abide by the terms of the lease.

Answers were filed by defendants, and the issues tendered were tried by the court sitting without a jury. Findings were filed and judgment rendered for defendants.

The evidence shows, apparently without conflict, that at the beginning of the term of the lease the Armstrongs took into their possession 1,440 ewes, 265 ewe lambs and 20 rams; that at the end of the first year the lease was orally renewed for another year on the same terms, and at the end of that year was again thus renewed, and that it was finally terminated at the end of May, 1943; that after its termination

the Armstrongs turned back to the estate 1,430 ewes, 280 ewe lambs and 17 rams. Defendant Ray Armstrong testified that he understood that under the terms of the lease he was to add to the flock each year 288 Rambouillet ewe lambs, and that he did so.

Appellants admit in their brief that the Armstrongs paid the stipulated cash rental each year and that they "did set aside and add to the flock 288 lambs for the 1940-1941 term, 288 lambs for the 1941-1942 term and 288 lambs for the 1942-1943 term, but the Lessees did not complete performance of their obligation to pay rent in lambs, by reason of the fact that they have failed and refused *to return* (Deliver in payment and satisfaction) to Lessor the 864 sheep due him as rent"; that the evidence conclusively establishes "that the Lessees were at all times obligated *to return to Lessor* 1440 ewes and 20 rams, which number of ewes and rams were established as the base level for the band of sheep and Lessees were obligated *to return* to Lessor 288 top Rambouillet lambs for the first, second and third terms of the lease for a total of 864 sheep. That the defendants have defaulted in the performance of the obligations due for the first term of the lease because they only returned to Lessor 1430 ewes, 17 rams and 280 lambs and defendants have defaulted in performance of the second and third terms of the lease for the reason that they have not returned to Lessor 576 sheep, the rental for those respective terms at 288 lambs for each term." (Italics theirs.)

The position of respondents as stated in their brief is that they were only required to *add* 288 lambs to the flock each year, and in the event the loss from death through no negligence of the lessees was so great as to forestall an increase of the flock, the maximum number they would be obligated to return would be 1,440 ewes, 20 rams and 288 lambs. They summarize the issue to be: "Were the lessees . . . obligated on May 31, 1943, to return to the executor of the estate . . . more than 1440 ewes and 288 ewe lambs and 20 rams where losses had occurred by death, due to no negligence on the part of said lessees, so great as to reduce the band to said number."

From these statements of counsel for the respective parties it is apparent that their difference of opinion is as to whether, regardless of losses, the Armstrongs were obligated to turn back to the estate at the termination of the lease in 1943 the

original number of sheep leased to them in 1940, to wit: 1,440 ewes, 265 lambs and 20 rams, and also 864 head of ewes in addition, representing 288 ewe lambs for each of the years 1941, 1942 and 1943. It is the contention of appellants that they were, while respondents contend that while they were required to and did add the 864 ewe lambs to the flock, nevertheless the losses were such that by the end of the term only 1,430 ewes, 280 lambs and 17 rams remained, and that these losses were due to "death from no negligence on the part of the lessees."

The trial court apparently adopted the construction of the lease contended for by respondents, for it found:

"2. That it is untrue that the minimum number of sheep required to be returned to H. P. B. Carden as executor of the Estate of Michael Keenan, deceased, by the defendants Mary Armstrong and Ray Armstrong under the terms of the lease referred to in said amended complaint was on May 31st, 1941, 2013 head.

"3. That it is untrue that on or about June 1, 1943, the defendants Mary Armstrong and Ray Armstrong returned to H. P. B. Carden as executor of the Estate of Michael Keenan, deceased, a flock of sheep that was less in number than they were required by said lease to return, or that the defendants Mary Armstrong and Ray Armstrong failed to comply with the terms of said lease to return to defendant H. P. B. Carden, as executor, the total number of sheep required thereby.

"4. That it is untrue that the defendants Mary Armstrong and Ray Armstrong failed to comply with any of the terms of said lease referred to as Exhibit A in plaintiffs' amended complaint.

"5. That it is untrue that the plaintiffs or the Estate of Michael Keenan, deceased, has suffered any loss or damage by reason of any acts or conduct of the defendants Mary Armstrong and Ray Armstrong, or that said Mary Armstrong and Ray Armstrong neglected or failed to maintain said flock of sheep in a proper and husband-like manner according to the best practice of animal husbandry practiced in the community in which such flock of sheep were maintained."

The substance of these findings is that though the Armstrongs received from the lessor a flock consisting of 1,725 head, and added thereto (as the Armstrongs testified) 864 ewe lambs, which without losses would have increased the

flock to 2,589 head, that though they turned back only 1,727 head the evidence is sufficient to show that the difference, or 862 head, were lost by death without negligence on the part of the lessees. The questions before us then are, is the lease agreement reasonably susceptible of the construction put upon it by the trial court, and, if so, does the evidence sustain the implied finding that the losses were not due to defendants' negligence.

█ The construction of the contract was primarily a matter for the trial court. In *Walsh* v. *Walsh,* 18 Cal.2d 439, the court said, pp. 443-444 [116 P.2d 62] :

"When a contract is in any of its terms or provisions ambiguous or uncertain, 'it is primarily the duty of the trial court to construe it *after a full opportunity afforded all the parties in the case to produce evidence of the facts, circumstances and conditions surrounding its execution and the conduct of the parties relative thereto.'* (*Barlow* v. *Frink,* 171 Cal. 165, 172 [152 P. 290].) (Italics added.) The governing principle as to when parol testimony may be introduced to explain the language of a contract or to ascertain the intention of the parties is clearly set forth in *Kenney* v. *Los Feliz Investment Co., Ltd.,* 121 Cal.App. 378, 386, 387 [9 P. 2d 225], as follows: 'It is a settled rule that when the language employed is fairly susceptible of either one of two constructions contended for without doing violence to its usual and ordinary import an ambiguity arises where extrinsic evidence may be resorted to for the purpose of explaining the intention of the parties, and that for this purpose conversations between and declarations of the parties during the negotiations at and before the execution of the contract may be shown (*Balfour* v. *Fresno C. & I. Co.,* 109 Cal. 221 [41 P. 876]).' And in *Scott* v. *Sun-Maid Raisin Growers Assn.,* 13 Cal.App.2d 353 [57 P.2d 148], the court stated at p. 359: 'When the meaning of the language of a contract is uncertain or doubtful and parol evidence is introduced in aid of its interpretation, *the question of its meaning is one of fact.* . . . (*Thomson* v. *Leak,* 135 Cal.App. 544, 548 [27 P.2d 795] ; *Gallatin* v. *Markowitz,* 139 Cal.App. 10, 13 [33 P.2d 424] ; *Coats* v. *General Motors Corp.,* 3 Cal.App.2d 340, 356 [39 P.2d 838].)' (Italics added.)"

In *McKee* v. *Lynch,* 40 Cal.App.2d 216, 226 [104 P.2d 675], it was said:

"We are not prepared to declare that the construction given

by the trial court to the entire transaction is an unreasonable construction or that it is untenable or so clearly inconsistent with the intent of the parties as disclosed by their language that we must substitute therefor the interpretation for which appellants contend. In such a situation it is settled that a reviewing court is not justified in disturbing the construction adopted by the trial court (*Whepley Oil Co.* v. *Associated Oil Co.,* 6 Cal.App.2d 94 [44 P.2d 670] ; *Shelley* v. *Byers,* 73 Cal. App. 44, 55 [238 P. 177].)''

In *Ross* v. *Pacific Mortgage Guaranty Co.,* 16 Cal.App.2d 672, 676 [61 P.2d 368], the court stated that the construction of an uncertain or ambiguous agreement by a trial court after taking oral evidence in aid of its interpretation must stand unless it is without support in the evidence.

 And where two constructions of a contract are equally reasonable that of the trial court will prevail. (*Estate of Northcutt,* 16 Cal.2d 683, 690 [107 P.2d 607]; *McNeny* v. *Touchstone,* 7 Cal.2d 429, 435-436 [60 P.2d 986]; *Estate of Wilson,* 40 Cal.App.2d 229, 234 [104 P.2d 716]; *Estate of Boyd,* 24 Cal.App.2d 287, 290 [74 P.2d 1049]; *O'Hare* v. *Peacock Dairies,* 26 Cal.App.2d 345, 354 [79 P.2d 433]; *Tide Water Associated Oil Co.* v. *Curtin,* 41 Cal.App.2d 884, 895 [107 P.2d 945]; *Richards* v. *Pacific S. W. Discount Corp.,* 44 Cal.App.2d 551 [112 P.2d 698].)

In the construction of a contract it is also generally held that where the terms are uncertain and capable of more than one reasonable construction, the practical construction put upon the instrument by the parties thereto, as evidenced by their conduct under it, furnishes one of the most reliable means of arriving at its meaning and their intention when executing it. (*Commercial Discount Co.* v. *Cowen,* 18 Cal. 2d 610, 615 [116 P.2d 599] ; *Tanner* v. *Title Insurance & Trust Co.,* 20 Cal.2d 814, 823 [129 P.2d 383]; *Roy* v. *Salisbury,* 21 Cal.2d 176, 184 [130 P.2d 706] ; *Moore* v. *Wood,* 26 Cal.2d 621, 629 [160 P.2d 772] ; *Universal Sales Corp.* v. *California Press Mfg. Co.,* 20 Cal.2d 751, 761 [128 P.2d 665] ; *Work* v. *Associated Almond Growers,* 102 Cal.App. 232, 235 [282 P. 965] ; *Union Sugar Co.* v. *Hollister Estate Co.,* 3 Cal.2d 740, 754 [47 P.2d 273] ; *Lemm* v. *Stillwater Land & Cattle Co.,* 217 Cal. 474, 481 [19 P.2d 785] ; *Rosenberg* v. *Geo. A. Moore & Co.,* 194 Cal. 392, 403 [229 P. 34] ; *Burns* v. *Peters,* 5 Cal.2d 619, 623 [55 P.2d 1182].)

As hereinbefore stated, the lease provided that the lessees

were to keep the flock of ewes and lambs up to 1,440 ewes and 265 lambs; and were to *add to the flock* each year 288 ewe lambs; that at the expiration of the lease they were to *return to lessor* 1,704 ewes, 288 ewe lambs and 20 rams, "less any ewes or lambs which may have been lost by death from no negligence on the part of lessees," provided that if the total number of ewes fell below 1,440, they were to furnish sufficient ewe lambs to bring the total number of ewes to 1,440 and the ewe lambs to 288.

From a reading of the record in the case it appears that the parties to the action were afforded an opportunity to produce evidence of the facts, circumstances and conditions surrounding the execution of the lease, as well as the conduct of the parties under it. The lessor, Carden, apparently construed the lease as contended by the Armstrongs, the lessees, for he testified that though he expected the increase of 288 head to be added to the flock each year, this increase was to be "Less the losses"; and he made no claim that the Armstrongs had not fully complied with the lease, though he did testify that he figured that the Armstrongs should have returned 1,748 head at the termination of the lease. (This would be 1,440 ewes, 288 ewe lambs and 20 rams.) In his answer to plaintiffs' complaint he denied that the assets of the estate had been depleted by any failure to perform on the part of the Armstrongs, and, it may be said, took a rather indifferent position in the matter. He stated that the Armstrongs claimed a loss so heavy that they could only return the minimum, but that he did not investigate how the loss occurred, and that he had never requested an accounting from them for the losses. And he made no demand at the end of any one of the three years during which the lease was in effect, that the lessees turn over or return to him the 288 ewe lambs that were to be added each year. Mrs. Armstrong did not testify as a witness, but Mr. Armstrong testified that his inability in 1943 to return the full number of sheep referred to in the lease, plus the 288 ewe lambs which he had added to the flock each year, was due to especially heavy losses in the mountains the summer of 1942, because of bears, coyotes and poison, as well as losses from old age and at lambing. He testified that in the care of the flock he used all the care and customary economy practiced by sheep men in the vicinity, always tried to have ample help to care for them, and himself stayed in the mountains most of the time when the

sheep were there. His testimony in this connection was corroborated by other witnesses who testified to the increasing hazards to sheep in the mountains in recent years from predatory animals and poisonous plants, and also by testimony that Armstrong's care of his sheep was on a par with that of other sheep men.

While plaintiffs produced some testimony to the effect that normally such a flock should have suffered no more than 5 per cent annually from natural causes and the loss would be less among young sheep, they did not show any negligence or lack of care on the part of the Armstrongs to which abnormal losses could be attributed. It is not contended by appellants that the Armstrongs ever sold to others any of the ewes, lambs or rams belonging to the estate, or that they held out any at the time the flock was turned over to the executor of the estate. And while it might perhaps be inferred from the very extensive losses and from testimony that the sheep were in poor condition when finally sold after the termination of the lease, that they had not had proper care, this was matter for determination by the trial court, and we cannot say, from the record, that its findings to the contrary are not supported by the evidence and proper inferences therefrom. We do not deem it necessary to give a further review of the evidence in the case; but, as was said in *Walsh* v. *Walsh, supra,* we are not prepared to declare that the construction given by the trial court to the entire transaction is an unreasonable one or that it is untenable or so clearly inconsistent with the intent of the parties as disclosed by their language, that we must substitute therefor the interpretation for which appellants contend. We must therefore say, as was said in that case, that, as a reviewing court, we are not justified in disturbing the construction adopted by the trial court.

However, it is admitted by respondents' counsel in their brief that since the Armstrongs, in 1943, turned back but 1,430 ewes they were 10 short of the required number. They say that this shortage was made up, however, because 411 ewe lambs were turned over, but say that "if the court should determine that such finding is not supported with respect to a shortage of ten ewes, respondents are quite willing that the trial Court be directed to amend its finding in this respect."

Reference to the testimony of Armstrong himself shows

that of the 411 lambs which respondents' counsel say were turned back, 131 belonged to the band which had been leased to Rex Keenan, and did not belong to the flock leased by the Armstrongs. It appears that there was not only a shortage of 10 ewes, but also a shortage of 8 ewe lambs and 3 rams for which defendants Armstrong should account to the estate, since the lease provided, as above stated, that if the losses were so great as "to cause the total number of ewes to fall below 1440, lessees must furnish sufficient ewe lambs to bring the total number of ewes to said 1440 and ewe lambs to 288''; and since respondents in their brief appear to admit that, in any event, this number of ewes and lambs, and 20 rams were to be accounted for and turned over to the executor.

Regarding issues raised in the third count and the request that the rights of plaintiffs under the will of Michael Keenan be declared, no reference to these issues is made in the briefs before this court, and the will itself is not in the record certified to us.

The judgment is reversed with directions to the trial court to amend its findings to accord with the decision of this court, and to enter judgment accordingly.

Peek, J., and Thompson, J., concurred.

A petition for a rehearing was denied August 29, 1946.