[Civ. No. 7243.   Fourth Dist.   April 10, 1964.]

PHILLIP L. McCRAY et al., Plaintiffs and Respondents, v. C. W. CARLSTROM, Defendant and Appellant.

Rubin, Seltzer & Solomon, Lawrence C. Bragg and Richard I. Singer for Defendant and Appellant.

Fredman, Karpinski, Silverberg & Shenas and Charles Elwyn Karpinski for Plaintiffs and Respondents.

GRIFFIN, P. J.—This action was brought by the plaintiffs, cross-defendants and respondents, Phillip L. McCray and Russell L. Brown (hereinafter called plaintiffs), lessees, against defendant, cross-complainant and appellant, C. W. Carlstrom, doing business as Linda Vista Development Company (hereinafter referred to as defendant) to determine the respective rights and obligations under a lease agreement dated and executed by them on October 23, 1961. The trial court determined that the lease was null and void and that neither party had any rights or duties thereunder. The defendant lessor contends that the lease is valid and subsisting and that the plaintiffs owe him the amount of rental payments due and unpaid and reasonable attorney's fees.

The lease was drafted by the defendant lessor's counsel and involved certain real property and a partial building to be used as a beer and wine bar and tavern. The relevant portions of the lease provisions are as follows:

### "3. *Beginning of the Lease Term.*

"The term of this Lease shall commence upon Lessee's obtaining from the State of California Alcoholic Beverage Control a license for the sale on-the-premises of beer and wine or upon the 4th day of January, 1962, whichever event shall occur first.

". . . . . . . . . . . . . .

### "9. *Rental Deposit.*

"It is understood and agreed that in lieu of a cash deposit for security for this Lease, Lessee will cause to be placed and made upon the above-described premises, certain improvements to improve the property so that it may be used for the retail sale of food and alcoholic beverages. Said improvements are listed upon 'Exhibit B' attached hereto and made part hereof.[1] It is understood and agreed that said improvements shall be at the sole cost and expense of Lessee and that upon the completion of said improvements, they shall become the property of Lessor. . . .

". . . . . . . . . . . . . .

### "35. *Condition to Lease.*

"It is expressly understood and agreed between Lessor and Lessee that all other rights and duties of this Lease are conditioned upon the Lessee obtaining within forty-five (45) days of the execution of this Lease, a license for the sale of beer and wine upon the above-described premises, and in the event that Lessee is unable to obtain said license, this lease shall be null and void.

"Lessee promises, covenants and agrees to use his best efforts in obtaining said license and promises and agrees to do all those things necessary and required in obtaining said license."

There was testimony and it was agreed that the lessees

---

[1]: "*Improvements*

"1. Share of prorata costs of partition which will be the northerly wall of leased premises.

"2. Remove and replace existing partitions where necessary in rest room area.

"3. Take out the plumbing where it is not useable, i.e., floor drains.

"4. Install the necessary plumbing to service the demised premises.

"5. Install any necessary electrical equipment to service the demised premises as agreed upon by Lessor and Lessee.

"6. Install drop ceiling.

"7. Install new asphalt tile floor.

"8. Install necessary items for City requirements for ventilation.

"9. Install necessary heating equipment."

applied for a beer and wine license from the Alcoholic Beverage Control Board (hereinafter referred to as Board) immediately after the lease was executed. Russell L. Brown, one of the lessees, testified that he did everything he could to get a license; that he deposited the fee with the application, published notice in the newspaper of such application and posted notice on the building of their intention to deal in intoxicating liquor. There was testimony that the lessees were not requested by C. W. Carlstrom to begin making the improvements. The application was pending for 45 days and apparently the license was then not issued by Board. Lessor did not send a demand for rent to the lessees until March 1962, a little more than four months after the lease was executed. After hearing, the trial court found:

"IV That said agreement is interpreted to mean, and does mean:

" . . . . . . . . . . . .

"(b) That the improvements, which the Lessees were to be obligated to make, under the provisions of Paragraph 9 of said lease agreement, were not required to be made before the commencement of the term of the lease . . .

" . . . . . . . . . . . .

"(e) That Lessees were to use their best efforts to obtain the license for the sale of beer and wine upon the leased premises, and to do all things necessary and required to obtain such license, but that they were not required to make the improvements called for by Paragraph 9 of the said written lease agreement prior to the commencement of the term thereof in their efforts to obtain such license.

"V Plaintiffs did, in fact, make an application to have such a license issued to them, and did all things necessary and reasonable in order to obtain such a license, and in no way failed to do anything required by them to be done to obtain the license.

" . . . . . . . . . . . .

"VII The lease contemplated the construction of certain improvements, but was ambiguous as to when the improvements were to be made.

"VIII There is no evidence that had the Lessees made the improvements that a license would have been issued by the State of California.

"IX . . . that if the Lessees had made the improvements, and had the license not then been issued, the said improvements would belong to the Lessor with no obligation on his

part to deliver possession to the Lessee or to pay for the improvements.

"X That the said lease became null and void forty-five (45) days after October 23, 1961."

The distinctive fact in this case is that the briefs totaled more than 90 pages, which is almost twice as many pages as are contained in the reporter's transcript of the trial.

■ There was no evidence produced from Board as to why the beer and wine license was not issued. About the only testimony on the subject came from plaintiffs on cross-examination. Brown testified that he did everything he could do to get the license; that he ordered certain equipment to be furnished and work to be done under the provisions of paragraph 9 of the lease, but did not make the improvements required. It is not definite whether the improvements required were those mentioned in paragraph 9, exhibit B, or certain added improvements required to be made to the premises before a license would be issued. He was asked if he knew why he did not obtain the license and he replied, "Yes." An objection was made as hearsay. Later, he was asked if he had been advised why he did not have the license issued and he replied, "No" but that he was told one reason; that he was not told by Board that if the building was fixed up, Board would give him a license. Counsel then produced Brown's deposition reciting the question: "Well, did you understand that if the building was fixed up that they would give you a license?" Brown answered, "Yes." A motion to strike the answer in the deposition was made and the court ruled, "... it is not impeaching" but did not order the answer stricken. In the cross-examination of plaintiff McCray, he was asked if he knew why the license had not been approved. He stated that he did not think he knew why it had not been approved and he had not been advised by any of the members of Board as to why it was not issued. Portions of his deposition were read wherein he was asked, "So the reason you didn't get the license was because the premises were not fixed up." Objection was made as calling for a conclusion of the witness, and the objection was sustained. His answer in the deposition was, "Yes." These depositions are now before this court. Brown testified therein that he operated a little restaurant near this building and defendant Carlstrom, through his agent Reed, suggested that he (Brown) and McCray lease this empty store; that about October 1 Carlstrom had his attorney draw up a lease; that plaintiffs had no attorney; that certain changes were suggested by

them as to percentage and Carlstrom was asked about remodeling the building and Carlstrom did not have the cash nor inclination, but Carlstrom's agent said he would apply $2,500 worth of prepaid rent toward the remodeling, making the premises useable for a tavern; that if the work suggested did not amount to $2,500 he would apply the difference on the cost of a partition between two buildings, but he said nothing about what would happen if the improvements cost more than $2,500; that they went down the same day and applied for the liquor license, i.e., on October 23, 1961; that one Dick Callahan told plaintiffs that the building structure was unsound; that Callahan was obtaining bids on the work; that Reed called Brown and asked why he did not obtain Callahan to do the work so Brown called Callahan about November 15, 1961; that he submitted a bid for $10,000 and it included rewiring of the whole building because the old wiring was condemned, and also included the plumbing, putting in doors and removing others for a tavern and a two-hour fire wall in the partition for which they were sharing the costs; that fireproofing of the ceiling and roof was necessary, also ventilation and lighting of the building and a "lot of stuff I didn't even know you had to have." Apparently, Callahan obtained a permit from the City of San Diego to remodel according to the requirements of the city.

Plaintiffs had ordered bar fixtures, stools, etc., built for $3,500 and paid $1,750 on them. Brown testified that when Callahan told him the cost was going to be $10,000 he called Reed and told him that plaintiffs could not possibly go on with the deal because they did not have the money to remodel a "beer joint," because it would still be a "beer joint," and that from Carlstrom's representations he was led to believe that it would not cost over $2,500; that Carlstrom told him he was 21 years old and could not get out of the lease; that later Carlstrom talked about plaintiffs' executing a note to the bank for $7,500 and placing a chattel mortgage on plaintiffs' fixtures and that Carlstrom would guarantee the loan; that the bank to which they went would not take Carlstrom's guaranty and could not take the fixtures as security.

In the deposition of plaintiff McCray, he testified that the basic problem is that plaintiffs were led to believe by representations of the defendant that the moneys required to put the premises in shape were much less than what they proved to be. He confirmed Brown's testimony about the $2,500 and

said that Reed told him that if the costs came to less than $2,500, plaintiffs would be expected to pay a portion of the cost of building the partition wall and this was before the lease was signed. He further testified that Reed agreed to allow the $2,500 against rent on the first three months and the last three months of the lease. It was stipulated between counsel that the witness did not know why the license had not been granted. Whether the trial court considered this evidence in the deposition in construing the lease agreement and the effect of paragraph 9 thereof is problematical. Certain portions of the deposition transcript were read into the record and reference to the facts related therein was made by counsel in his statement of the facts of the case to the trial judge. At one point, in discussing certain claimed impeachment testimony from the deposition, the trial judge remarked, "Well, it doesn't make any difference whether it's impeachment or not. The deposition may be read into evidence." At the close of the case, counsel for defendant remarked to the court: "I request that the original deposition of Russell Brown and Phillip McCray be filed with this court." Mr. Karpinski then said, "No problem. Consider them so filed." However, the trial court, in its findings, found: "That said written lease agreement contains a complete expression of the agreement between the parties thereto, and that there were no promises, representations, agreements, warranties, or inducements, express or implied, other than as set forth in said written lease agreement.

". . . . . . . . . . . . .

"The lease contemplated the construction of certain improvements, but was ambiguous as to when the improvements were to be made.

". . . . . . . . . . . . .

"That the improvements, which the Lessees were to be obligated to make, under the provisions of Paragraph 9 of said lease agreement, were not required to be made before the commencement of the term of the lease, and said improvements, under the terms of said Paragraph 9 of said written agreement, included a partition; and that that partition was one to be installed by Defendants, the pro-rata cost of which was to be paid to the Defendants by the Lessees, and that the Lessees did not have the obligation to install such partition." It would therefore appear that the testimony set forth in the depositions, even if not admissible to modify or change the terms of the written agreement, would prove to be of considerable value in determining the meaning and terms

of the lease agreement and its provisions as they exist. In *Enos* v. *Armstrong*, 75 Cal.App.2d 663 [171 P.2d 137], it was said that when a contract or a provision thereof is uncertain it is primarily the duty of the trial court to construe it after a full opportunity has been afforded the parties in the case to produce evidence of the facts, circumstances and conditions surrounding its execution and the conduct of the parties relative thereto.

It was agreed during the trial that the pretrial order reciting the issues and admissions, subject to objection of materiality, should contain a statement that counsel for plaintiffs was sure someone on the Board told plaintiffs that they could see nothing that would prevent their getting a license if the improvements were made. It was agreed that defendant delivered the key to plaintiffs, but plaintiffs never used it or took possession and no statement of rent was sent for rent due and no rent was ever paid by plaintiffs.

Although the reporter's transcript does not support the opening statement of the basic facts of the case to the trial judge by counsel for plaintiffs, it was there brought to the attention of the court that the depositions showed that one reason why the license was not issued was that about $11,000 worth of improvements had not been made by the lessees; that these requirements were in addition to those set forth in paragraph 9; that Board required the additional improvements to be made by lessees before a license would issue; that the lessees would have had to expend a large amount of money (whether it was $11,000 or $150,000) to put this building in shape for the issuance of a license; and that the lease could not be so construed as requiring this of these lessees.

On the question of whether plaintiffs used their best efforts in obtaining said license and did all the things necessary and required in obtaining said license, the court found that the lease was ambiguous as to when the improvements were to be made; that: "There is no evidence that had the Lessees made the improvements that a license would have been issued by the State of California.

". . . that if the Lessees had made the improvements, and had the license not then been issued, the said improvements would belong to the Lessor with no obligation on his part to deliver possession to the Lessee or to pay for the improvements.

". . . . . . . . . . . . . . . .

"That it is true that Plaintiffs, at some time, were advised by an employee or agent of the Board of Alcoholic Beverage Control, that their application for a beer and wine license would not be considered until certain improvements would be made upon the premises covered by said lease, but that it is not known whether such information was imparted to Plaintiffs prior to or after a date forty-five (45) days subsequent to the execution of the lease.

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"That it is not known whether the improvements referred to in the two Findings immediately preceding this one were the improvements set forth in Exhibit 'B' of said leasehold agreement and referred to in Paragraph 9 of said leasehold agreement."

Certain technical objections are made to the rulings of the trial court in reference to the admissibility of portions of the depositions which might amount to impeachment of plaintiffs' testimony as to the reasons why Board would not issue them a license. No license was issued and any reasons assigned by plaintiffs or anyone else would not be entirely convincing as being the cause of the action of Board. But, even assuming it was because plaintiffs had not installed or made the improvements set forth in exhibit B, paragraph 9, there was no date set in the lease when these improvements should be made by the lessees or that they must be made before a license would issue. In fact, exhibit B, paragraph 9, requires that plaintiffs and defendant share prorata the costs of the partition to be constructed at the northerly wall of the leased premises. We find no record of any offer to share these costs on behalf of defendant. The installation of any necessary electrical equipment was subject to the *agreement of lessor and lessees*. There is no evidence of any such agreement or its terms or limitation of expense involved. No date is set when this installation should be made. ▆ It therefore appears that a reading of the entire lease and agreement of the parties, including the possibility that additional improvements besides those contained in exhibit B, paragraph 9, were required to be installed before a license would be issued, and the application of paragraph 35 thereto; that all other rights and duties of this lease were conditioned upon the lessees' obtaining within 45 days a license for the sale of beer and wine; and that in the event that lessees were unable to obtain said license the lease would be null and void, would clearly show that it was the intention of the parties that the lease is

and would be null and void if the license was not obtained. Paragraph 9 set forth "other rights"; these appear to be other rights, therefore paragraph 35 would apply thereto.

There is no sufficient showing that had the plaintiffs completed only the improvements agreed upon in exhibit B, paragraph 9, plaintiffs would have been given a license. The findings of the trial court have evidentiary support. Even if the rulings on the offers of the portions of the depositions by way of impeachment were erroneous, we conclude that they were not prejudicial.

Judgment affirmed.

Coughlin, J., and Brown (Gerald), J., concurred.

A petition for a rehearing was denied May 7, 1964, and appellant's petition for a hearing by the Supreme Court was denied June 3, 1964.